**UNITED STATES of America,**

v.

**Robert A. MONGELLI, Defendant.**
**(Two Cases)**

No. 91 Cr. 821 (JSM).
No. M–11–188.
Judgment No. 930218 WP.

United States District Court,
S.D. New York.

June 30, 1994.

Michael L. Tabak, Kathleen A. Zebrowski, Aimee B. Wolfson, Asst. U.S. Attys., for plaintiff.

Michael M. Milner, Milner & Daniels, New York City, for Robert Mongelli.

## MEMORANDUM ORDER

MARTIN, District Judge:

Perhaps the least recognized victims of crimes are the families of the criminals. If those contemplating the commission of a crime could foresee the utter devastation their arrest and conviction would inflict on their families, few would be hard-hearted enough to commit the crime.

In most cases, the criminal's callousness to the risk of injury to his family may be explained by the fact that the criminal did not expect to be caught. In the case presently before the Court, however, Robert Mongelli has caused and continues to cause extreme damage and pain to his wife and children, first by his crimes of which he stands convicted and now by his knowing and wilful refusal to obey a lawful order of this Court. By the simple act of obeying this Court's order, Mongelli could end his family's ordeal and perhaps obtain a remission of the civil fines which his lawyer argues have so devastated his family.[1]

Rather than take this straightforward way out of his family's problems, Mongelli schemed with all too compliant lawyers, paid by his brother, to have a sham divorce proceeding commenced in his wife's name so that his assets could be sequestered in that proceeding and thereby protected from the Government's attempt to enforce a contempt judgment of this Court.[2]

On June 7, 1994, this Court conducted a hearing to determine whether a divorce action commenced on October 1, 1993 by Robert Mongelli's wife, Joann, was a sham.

---

1. In recorded telephone calls from prison Mr. Mongelli blames the prosecution and the Court for his family's problems. But the pain that conviction and imprisonment inflict on the criminal's family is not the fault of the prosecutor or the judge who imposes sentence. The blame rests entirely on the defendant who knowingly and wilfully exposed his family to that risk when he committed the crime.

2. The legal and factual background of these proceedings was set forth in an opinion of this Court dated May 6, 1994 and a memorandum and order of the Honorable John F. Keenan dated March 30, 1994.

Based on the evidence produced at that hearing, the Court finds that the divorce proceeding was indeed a sham, conceived and orchestrated by Robert Mongelli and his lawyers for the purpose of frustrating this Court's contempt orders.

While Kenneth Kemper, the lawyer who purports to represent Mrs. Mongelli in this proceeding, testified that the divorce action was commenced in good faith solely at her behest, his testimony is contradicted by a memorandum from the files of his own firm,[3] prepared by his associate, in which the genesis of the divorce action is set forth as follows:

Robert Mongelli's criminal lawyers came to us to ask our advice about what, if anything, could be done to protect the remaining assets from the civil contempt judgment. Here's what we did:

We started a divorce proceeding in behalf of Joann, and by order to show cause, (with notice to the feds) had a Receivor [sic] and Sequestrator appointed to take possession and title to the liquid marital assets. (Parenthetically, our client does not really want a divorce. She happens to be a *lovely* lady with three children— someone whom both Ken and I like a lot— not at all your idea of a Mafia wife. Our grounds for divorce are the imprisonment for three years of the husband (which claim has not really ripened, which the feds don't seem to have picked up on, but which we acknowledged up front to the state court judge, telling him we would amend to cruelty if it became necessary. So far, it hasn't)). After getting our Receiver in place, we made a motion for *pendente lite* support.

That Robert Mongelli, and not his wife, was the moving force behind the divorce action and the fact that she did not want a divorce is also established by the contents of telephone conversations between Robert Mongelli and others that were monitored and

tape-recorded as a routine procedure at the prison where Mongelli was incarcerated.

The collusive nature of this divorce proceeding is demonstrated by phone conversations between Mongelli and Mr. Kemper, in which they scheme to delay the filing of the divorce action so that it does not interfere with Robert Mongelli's negotiations for a modification in his plea agreement. That the lawyer appearing for Mrs. Mongelli was carrying out Robert Mongelli's wishes is reflected in a portion of the conversation where Mongelli states:

Listen, Mr. Kemper, I, you know, uh, there is nothing I can say to charge you up. I think you heard enough from Mike [Mongelli's criminal lawyer] and Mike has laid it out well for you.

\*    \*    \*    \*    \*    \*

I appreciate your taking the case and thank you very much. If there is anything I can do to help please, I'm here. You know how to get me.

This is hardly the type of exchange one would expect to hear between a husband and his wife's lawyer in a bona fide divorce action.

It is also noteworthy that the documents and computer disks eventually produced by Mr. Kemper establish that his office actually drafted affidavits for Mr. Mongelli in response to his wife's divorce action which Mr. Kemper was directing. The office then billed for this work, which bills were being paid largely by Mr. Mongelli's family.

The transcripts also make clear that Mrs. Mongelli does not really want a divorce and is instituting the action at her husband's urging. For example, in a conversation on October 1, 1993, the day the divorce action is filed, Robert Mongelli tells the divorce lawyer how he persuaded his wife to file the action:

day of the hearing when at the direction of the Court his firm's files were produced, he misrepresented to the Government's counsel that the litigation bag in which this memorandum was ultimately discovered, contained only copies of court files.

---

**3.** It does not appear happenstantial that, although Mr. Kemper was told at a pre-hearing conference with the Court that all files of lawyers or other professionals who Mrs. Mongelli intended to call at the hearing would have to be produced or during the week prior to the hearing, his own files were not produced. Then, on the

I said, 'ya know Joann, these are 26 beautiful years.' I said, 'This is a technical thing.' I said, 'Put your religion on the side. You've never done a wrong thing, maritally, in your life. Put everything else on the side. See, you're trying to put a house, a roof over your kids' head and pay your expenses. Don't feel bad about it. Have your conscience clear. It's not a moral issue' I says, 'and if you want to marry me in four years, you can marry me again.'

These and other portions of the transcript clearly contradict the testimony offered by the Mongellis that the divorce action was Mrs. Mongelli's idea bravely pursued over the opposition of her husband. While it may be that Mrs. Mongelli considered divorce at various points during her marriage—a not atypical occurrence in many marriages that last for life—the evidence presented at the hearing overwhelmingly establishes that this divorce action was orchestrated by her husband and his lawyers and would not have been filed but for his urgings. Mrs. Mongelli never had an intent to terminate her marital relationship with Robert Mongelli, and the proceedings that were commenced were a sham filed for the sole purpose of frustrating this Court's contempt order.

The Court's conclusion that the divorce proceeding is a sham is the same as that reached at the time by Mongelli's original criminal lawyer. This was reported by Mongelli in a tape recorded conversation: "Ben is saying, uh, that's just a sham."

Not only was the divorce action commenced on October 1, 1993 in Joann Mongelli's name a collusive sham, it was also fraudulent since it was premised on grounds for divorce that counsel knew did not exist. The divorce petition alleged that Joann Mongelli was entitled to a divorce under Section 170(3) of the New York State Domestic Relations Law. That section lists as grounds for divorce:

The *confinement* of the defendant *in prison* for a period of three or more years. (emphasis added).

As counsel well knew, as of October 1, 1993, Robert Mongelli had been incarcerated for less than six months, and, therefore, there were no grounds for divorce under § 170(3). *See* McKinney's § 170, Practice Commentary C170:10, *citing Short v. Short,* 57 Misc.2d 762, 293 N.Y.S.2d 590 (Sup.Ct. Queens Co.1968). *See also Cerami v. Cerami,* 95 Misc.2d 840, 408 N.Y.S.2d 591 (Sup. Ct. Monroe Co.1978); *Pergolizzi v. Pergolizzi,* 59 Misc.2d 1027, 301 N.Y.S.2d 366 (Sup. Ct. Kings Co.1969); *Colascione v. Colascione,* 57 Misc.2d 199, 291 N.Y.S.2d 559 (Sup. Ct. Nassau Co.1968).

In an attempt to establish the legitimacy of the divorce action, Kenneth Kemper, the lawyer who filed it, testified at the hearing that the McKinney's commentary was wrong in stating that a divorce action could not be commenced until after the defendant had been in prison for three years and that the above authorities were overruled in *Kane v. Kane,* 163 A.D.2d 568, 558 N.Y.S.2d 627 (2d Dept.1990). The Court finds that this testimony of Mr. Kemper was not simply wrong as a matter of law, it was a deliberate lie intended to mislead the Court.[4] No one as bright as Mr. Kemper could read *Kane v. Kane* as indicating in any way that a divorce action under § 170(3) could be maintained before the defendant had been in jail for a period of three years.

In *Kane v. Kane,* the husband was imprisoned in November 1982 for murder for a term of 15 years to life. Thus, the husband had been in jail for five years when, on December 31, 1987, the wife filed a counterclaim for divorce under § 170(3) in a divorce action originated by the husband by service of a summons in 1981. The Court's description of the counterclaim as "technically premature," which according to Mr. Kemper represented the overruling of the above cases, had nothing to do with the length of the husband's confinement in prison but referred to the fact that the counterclaim was filed in an action commenced by the service

---

**4.** In view of the fact that the Court finds that Kenneth Kemper deliberately lied under oath, the Court is sending copies of this opinion to the Grievance Committee of this Court and the Appellate Division, First Department.

of a summons before any complaint was filed. *Id.* 558 N.Y.S.2d at 628–29.

It is hard to understand why a lawyer would tell such a bare-faced lie, but the facts and Mr. Kemper's demeanor leave no question that his testimony was deliberately false and, on the whole, unworthy of belief. His false exculpatory testimony provides further evidence that Mr. Kemper knew the divorce action to be fraudulent the day he filed it.

But even if New York law gave Mrs. Mongelli the right to divorce her husband because he had been sentenced to jail for more than three years, the Court could not permit a collusive action such as this to be utilized as a vehicle to transport Robert Mongelli's assets to a safe haven where they could not be seized to enforce the contempt order of this Court.

The New York Domestic Relations law was not designed to regulate creditors' rights. One cannot believe that, in enacting the financial protections provided to a spouse with legitimate grounds for divorce, the legislature intended to provide the family of the spouse whose conduct has given grounds for divorce greater protection from creditors than would be accorded to the family of a spouse who has so completely fulfilled his marriage vows that no grounds for divorce existed. There are provisions in both the New York Creditors Rights law and the federal bankruptcy code that attempt to balance the interests of a bankrupt individual's creditors and the family members who depend on the bankrupt for their support. *See* 12 New York Debtor and Creditor Law § 282; 11 U.S.C. § 522. That is not the purpose of the Divorce Law.

■ Indeed, both federal and New York courts have recognized that the use of a collusive divorce proceeding to transfer assets between spouses results in a fraudulent conveyance of property that should be set aside. *See, e.g., United States ex rel. Hartigan v. Alaska,* 661 F.Supp. 727, 730 (N.D.Ill. 1987) (setting aside transfer of assets intended to frustrate collection of judgment by government, the court held that divorce "was certainly never intended to be a vehicle to effect a fraudulent end, or to transmute that which would otherwise be fraudulent into something lawful") (citation omitted); *McDonald v. Jarrabet,* 188 A.D.2d 1045, 591 N.Y.S.2d 676 (4th Dept.1992) (asset transfer related to divorce could be set aside if intent to defraud creditors shown); *New York v. Goldstein,* 170 A.D.2d 789, 565 N.Y.S.2d 892 (3d Dept.1991) (same).

■ As has long been recognized, "[t]he power to punish for contempt is inherent in all courts; its existence is essential to the preservation of order in judicial proceedings, and to the enforcement of the judgments, orders and writs of the courts...." *Ex parte Robinson,* 86 U.S. (19 Wall.) 505, 510, 22 L.Ed. 205 (1873). Our judicial system could not function if litigants were free to evade lawful orders of the Court. The record here clearly establishes that the divorce action instituted by Joann Mongelli on October 1, 1993 was a collusive sham designed to frustrate the Court's ability to enforce the sanctions it imposed to compel Robert Mongelli to comply with its lawful order. It would be intolerable for this Court to permit that action to succeed in any way.

For the foregoing reasons, this Court hereby vacates any and all orders heretofore entered by the Supreme Court of the State of New York relating to the custody and control of the assets of Robert Mongelli and orders Arnold Mazel, Esq. to turn over forthwith to the federal monitor, Nicholas Scopetta, Esq., all of the assets of Robert Mongelli presently in his custody and control. In addition, by July 8, 1994, Mr. Mazel is to provide this Court and Government counsel with an accounting of all funds distributed by him from the Mongelli assets. On receipt of that accounting, the Government shall cause a copy of this opinion to be served on all parties who have received payment out of the Mongelli assets from Mr. Mazel and these parties are to show cause before this Court in Room 443 of the U.S. Courthouse at 10 a.m. on July 22, 1994, why an order should not be entered requiring them to repay to the monitor any funds they received out of the Mongelli assets.

**SO ORDERED.**