**UNITED STATES of America,
Plaintiff,**

v.

**Ralph L. SCHIPPERS, Defendant.**

Criminal No. 4:12–cr–131.
Case No. 4:12–mj–135.

United States District Court,
S.D. Iowa,
Central Division.

Nov. 1, 2013.

Andrew H. Kahl, Maureen McGuire, United States Attorney's Office, Des Moines, IA, for Plaintiff.

Timothy Francis McCarthy, II, McCarthy & Hamrock, PC, West Des Moines, IA, for Defendant.

## ORDER

JOHN A. JARVEY, District Judge.

## I. INTRODUCTION

This matter comes before the Court pursuant to two objections—one to a restitu-tion order and another to a writ of gar-nishment—filed by Marla Schippers ("Marla").[1] The first objection was filed on February 7, 2013. Marla objected to this Court's order dated February 5, 2013, directing that the proceeds from the sale of her marital home ($38,766.96) be paid toward restitution owed by her former husband, Defendant Ralph Schippers ("Ralph"). [Dkt. No. 5 Page 2, Order No. 4:12–mj–135.] The second objection was filed on April 4, 2013. Marla objected to a writ of garnishment relating to Ralph's 401–K account dated March 27, 2013.[2] [Dkt. No. 36 Page 2.] In her objections, Marla alleges that she was awarded one-half of these assets in a decree of dissolu-tion of marriage on August 23, 2012. In addition, Marla argues that she is entitled to one-half of the net proceeds from the sale of the marital home based on a statu-tory dower interest. Accordingly, she re-quests that one-half of the proceeds from the sale of the marital home and Ralph's 401–K account ("the subject properties") be released to her. This Court held a hearing on her objections on April 24, 2013.

The Government filed a resistance to Marla's objection to the restitution order. [Dkt. No. 35.] On April 5, 2013, the Gov-ernment also filed a response to Marla's objection to the garnishment of Ralph's 401–K account. [Dkt. No. 38.] The Gov-ernment contends that the Court should deny any claim by Marla to the funds from the marital home or Ralph's 401–K account because Marla does not have an ownership

1. All references to a docket number will refer to the criminal docket for case number 4:12–cr–131 unless otherwise indicated. The other case numbers in this order concern civil pro-ceedings and remedies based on the underly-ing criminal docket for case number 4:12–cr–131.

2. Ralph pleaded guilty to embezzling money from his employer, Granger Motors, on Sep-tember 17, 2012. [Dkt. No. 11.] On January 17, 2013, Ralph was ordered to pay restitu-tion in the amount of $1,433,825.37. [Dkt. No. 26 Page 5.]

interest in the subject properties, and the transfer of these assets in the divorce decree constituted fraudulent transfers. The Government argues that the subject properties should be applied in full to the restitution Ralph owes. This Court agrees, and it denies Marla's claims to the subject properties for two reasons.

First, Marla never acquired an ownership interest in the subject properties through her divorce decree because two federal district judges had issued restraining orders on the properties prior to the filing of the divorce petition that remained in effect until the end of Ralph's criminal case, when he was sentenced on January 17, 2013.[3] Before the restraining orders were entered, Ralph owned the properties separately, and based on Iowa law, the property transfers made to Marla must be set aside because the conveyances were unreasonable, inequitable, and fraudulent. *See Nichols v. Nichols,* 526 N.W.2d 346, 348–49 (Iowa 1994); *see also Travelers Indem. Co. v. Cormaney,* 258 Iowa 237, 138 N.W.2d 50, 58 (1965). This Court also finds that Marla does not have a statutory dower interest in these assets as Marla is not married to Ralph, and Ralph is not deceased. *See Freedom Financial Bank v. Estate of Boesen,* 805 N.W.2d 802, 811 (Iowa 2011).

Second, the transfers of the subject properties through the divorce decree must be set aside as void because the transfers were fraudulent in violation of federal laws. In considering the factors under 28 U.S.C. § 3304(b)(2), this Court finds that Ralph had the "actual intent to hinder, delay, or defraud a creditor" under 28 U.S.C. § 3304(b)(1)(A): Marla was an "insider"; there were mounting criminal and civil suits against Ralph before the transfers were made; Ralph transferred substantially all of his assets to Marla; Ralph did not receive equivalent value for the transfers; Ralph was insolvent before and after the transfers occurred; and the transfer occurred shortly before Ralph incurred a substantial debt. *See* 28 U.S.C. § 3304(b)(2); *see also United States v. Sherrill,* 626 F.Supp.2d 1267, 1274 (M.D.Ga.2009).

Federal courts have reached different conclusions as to whether a defendant had "actual intent" to fraudulently transfer property when confronted with similar "badges of fraud."[4] However, even if

---

3. Two federal district judges issued restraining orders on the proceeds of the home and Ralph's 401–K account on June 28, 2012, and August 7, 2012, respectively. The same state court judge that entered Marla and Ralph's divorce decree on August 23, 2012, filed an order *nunc pro tunc* on September 24, 2012 recognizing the federal court orders. As explained by the Iowa district court, Marla's interest in the properties "is subject to the Petitioner [Marla] *making a claim for said items in Federal Court as there is currently a restraining order prohibiting distribution of said funds.*" [Dkt. No. 38–2] (emphasis added). Marla's divorce decree "does not create an interest that would supersede this Federal Court Order [the restraining orders prohibiting the distribution of the subject properties] *until if and when the Federal Court grants the Petitioner [Marla] said interest.*" [Dkt. No. 38–2 Page 1] (emphasis added).

4. Federal courts have held defendants had an "actual intent to hinder, delay, or defraud a creditor" under § 3304(b)(1)(A) based on an analysis of the factors under § 3304(b)(2). *See, e.g., Morris v. Holder,* No. 2:11–cv–783–WHA, 2012 WL 3292900, at *7 (M.D.Ala. Aug. 10, 2012); *see also United States v. Walston,* No. 07 CR 580–5, 2011 WL 3876932, at *3 n. 2 (N.D.Ill. Aug. 31, 2011); *United States v. White–Sun Cleaners Corp.,* No. 09–CV–2484, 2011 WL 1322266, at *12, *14 (E.D.N.Y. Mar. 9, 2011); *In re Porter v. Porter and Atlantic Auto Group, Inc.,* No. 06–10119, 2009 WL 902662, at *21 (Bankr.D.S.D. Mar. 13, 2009); *Sherrill,* 626 F.Supp.2d at 1274; *United States v. Midgett,* No. 3:99CR181–1, 2006 WL 517661, at *2 (W.D.N.C. Mar. 1, 2006); *United States v. Barrier Industries,* 991 F.Supp. 678, 682 (S.D.N.Y.1998); *United States v. Teeven,* 862 F.Supp. 1200, 1215 (D.Del.1992). In contrast, other federal courts were reluc-

Ralph did not commit *actual fraud* under § 3304(b)(1)(A), the Government is still entitled to the recovery it seeks as the transfers meet the statutory standard for *constructive fraud* under § 3304(b)(1)(B)(ii). The transfers were absent reasonably equivalent consideration, and Ralph "believed or reasonably should have believed he would incur debts beyond his ability to pay as they became due." *See* 28 U.S.C. § 3304(b)(1)(B)(ii); *see also United States v. Woods,* No. 5:07–CV–187–BR, 2008 WL 9375548, at *3 (E.D.N.C. Dec. 10, 2008).

■ The Mandatory Victims Restitution Act ("MVRA") grants the Government the authority to use the collection procedures of the Federal Debt Collection Procedures Act ("FDCPA") to enforce restitution ordered as part of a criminal sentence. *See United States v. Yielding,* 657 F.3d 722, 726–27 (8th Cir.2011); *see also United States v. Witham,* 648 F.3d 40, 49 (1st Cir.2011); *United States v. Kollintzas,* 501 F.3d 796, 800–01 (7th Cir.2007); *United States v. Mays,* 430 F.3d 963, 965–66 (9th Cir.2005); *United States v. Phillips,* 303 F.3d 548, 550–51 (5th Cir.2002). Based on the MVRA and FDCPA, Ralph's fraudulent transfers are set aside to satisfy Ralph's debts to Granger Motors and Universal Underwriters Insurance Company. Marla Schippers's requests to release one-half interests in the proceeds from the sale of the marital home and Ralph's 401–K account to Marla are DENIED.

## II. FACTS

In approximately January of 1998, Ralph began embezzling money from his employer, Granger Motors. It was not until May of 2012 when Ralph's breach of his employer's trust came to light. At that time, Granger Motors reported Ralph's conduct to the Federal Bureau of Investigation ("FBI"), following which the FBI learned that Ralph embezzled over $1 million from Granger Motors. On May 18, 2012, Ralph's employment was terminated.

On June 28, 2012, U.S. District Court Judge Ronald Longstaff issued a restraining order with respect to Ralph's real property, his residence, until the end of Ralph's criminal case. [Dkt. No. 2, Order No: 4:12–mj–135.] The marital home was sold on July 20, 2012, and the net proceeds from the sale ($38,766.96) were placed in the Clerk of Court's registry. U.S. District Court Judge Harold Vietor issued a restraining order on August 7, 2012 to restrain Ralph or any family member from taking any action that would affect Ralph's 401–K account until Ralph's criminal case concluded. [Dkt. No 2, Order No: 4:12–mj–164.]

Shortly thereafter, on August 13, 2012, Ralph's wife, Marla, filed a petition for dissolution of marriage in the Iowa District Court for Dallas County. The decree included an agreement that Marla would

---

tant to find "actual intent to hinder, delay, or defraud a creditor" under § 3304(b)(1)(A), as a matter of law, even with the presence of some "badges of fraud" under § 3304(b)(2). *See, e.g., United States v. Kirtland,* No. 11–4090–JTM, 2012 WL 4463447, at *14 (D.Kan. Sept. 27, 2012) (citing *United States v. Vernor,* No. Civ. SA–03–CA–511–FB, 2005 WL 3465847, at *4 (W.D.Tex. Feb. 11, 2005) and *In re Phillips & Hornsby Litig'n and The Fraudulent Transfer Action,* 306 F.Supp.2d 631, 639 (M.D.La.2004)); *see also United States v. Pritchett,* No. 5:09–CV–322–F, 2011 WL 197763, at *6 (E.D.N.C. Jan. 20, 2011); *United States v. Forbes,* 740 F.Supp.2d 334, 341 (D.Conn.2010) (citing *United States v. Moore,* 156 F.Supp.2d 238, 245 (D.Conn. 2001)). Finally, some courts refused to address if a defendant acted "with actual intent to hinder, delay, or defraud" creditors under § 3304(b)(1)(A) where the evidence showed that the defendant made a fraudulent transfer under § 3304(b)(1)(B). *See, e.g., United States v. Kincaid,* No. 06–CR–30073, 2011 WL 6329613, at *9 (C.D.Ill. Dec. 19, 2011).

receive one-half of Ralph's 401–K plan and one-half of the proceeds from the sale of their marital home. The decree of dissolution was filed on August 23, 2012, and it dissolved the marriage between Ralph and Marla.

On September 17, 2012, Ralph pleaded guilty to an information charging him with wire fraud. Seven days later, the same court that filed Marla and Ralph's divorce decree, entered an order *nunc pro tunc* recognizing the restraining orders that had been issued by the federal district courts on the subject properties in June and July of that year. [Dkt. No. 38–2 Page 1.] The order *nunc pro tunc* provided that any interest Marla had in Ralph's 401–K, and any interest Marla had in the proceeds from the sale of the marital house, were still subject to the federal court orders.

On January 17, 2013, Ralph was sentenced to a term of imprisonment of forty-one months. He was also ordered to pay restitution in the amount of $1,433,825.37. [Dkt. No. 26 Page 5.] On February 5, 2013, this Court entered an order that the funds held by the Clerk of Court be paid toward the restitution Ralph owed. On March 26, 2013, the Government requested that a writ of garnishment be issued to Fidelity Investments to garnish Ralph's 401–K account, and it was issued on March 27, 2013. Marla objected to this Court's orders, arguing that she was entitled to one-half of the funds based on a divorce decree.

## III. DISCUSSION

This Court first addresses the issue of whether Marla can recover a one-half interest in the proceeds from a marital home and 401–K account based on a divorce decree. In resolving that issue, the Court makes two findings, which leads it to deny Marla's claims:

(1) Marla does not have an ownership interest in the subject properties based on her divorce decree because two federal district judges entered restraining orders on the properties before the divorce petition was filed that preserved the assets for future resolution. Prior to the entry of the restraining orders, the subject properties were Ralph's separate properties, and to distribute a one-half interest in the subject properties to Marla would be unreasonable, inequitable, and fraudulent under Iowa law. Additionally, Marla does not have a statutory dower interest in the properties as Marla is no longer Ralph's wife, and Ralph is not dead.

(2) The transfers in the divorce decree must be set aside because they were fraudulent under § 3304(b)(1)(A) and § 3304(b)(1)(B)(ii). The Government presented sufficient evidence to show that Ralph had the "actual intent to hinder, delay, or defraud a creditor." *See* 28 U.S.C. § 3304(b)(1)(A). Also, the transfers were made absent reasonably equivalent consideration, and Ralph "believed or reasonably should have believed he would incur debts beyond his ability to pay as they became due." *See id.* § 3304(b)(1)(B)(ii).

### A. Marla Schippers Has No Ownership Interest in the Subject Properties

#### 1. Marla Schippers's Arguments

At the April 24, 2013 hearing, Marla's counsel argued that Marla has an ownership interest in both properties. Marla is entitled to the proceeds from the sale of the home based on her equal contributions to its mortgage,[5] and her "statutory dower

---

5. Marla has not provided evidentiary submissions in support of her objections to prove how she contributed to the home's mortgage.

Instead, Marla has conceded that Ralph "bought the house." She also noted the mortgage was paid out of a "joint banking

interest right that was awarded to her in her divorce decree." "It wasn't Mr. Schippers' property to transfer ... We believe that it was Ms. Schippers' from the time the divorce decree was entered." Marla's counsel claimed Marla has a statutory right to the home even if Marla's name was not on the mortgage or deed. Yet, Marla's counsel does not cite in its objections (or at the April 24, 2013 hearing) any statute or case law supporting these propositions. Additionally, Marla's counsel alleged that under Iowa law, Ralph's pension is equally Marla's income after their 20–year marriage. Marla is only seeking "her share" and is "not trying to take anything away from the victims in this case."

## 2. The Government's Arguments

The Government takes issue with the claim that Marla has any "ownership interest" in the properties, which belonged to Ralph at the time the restraining orders were entered and until his criminal judgment. [Dkt. No. 35 Page 3]; [Dkt. No. 38 Page 3.] Citing *Nichols*, 526 N.W.2d at 348–49, the Government argues that in Iowa "one spouse may own property independent of the other," and since Marla has no interest in the home, she has no interest in its proceeds. [Dkt. No. 35 Page 3.] Nor does Marla have an interest in the 401–K account. Here lies the crux of the Government's argument: because the district court's order *nunc pro tunc* did not award interests in the properties to Marla, but recognized the federal courts' restraining orders, and Ralph owned the properties at the time his criminal judgment was entered, the properties should be applied to Ralph's restitution order in accordance

with 18 U.S.C. § 3613(c).[6] [Dkt. No. 38 Page 3.]

## 3. Federal Courts Issued Restraining Orders Preserving Assets for Future Resolution

Judge Longstaff issued a restraining order on the proceeds of Ralph's home on June 28, 2012. Judge Vietor issued another restraining order on Ralph's 401–K account on July 20, 2012. The restraining orders were put in effect when only Ralph's name was on the home's mortgage, title, and deed, and the 401–K account. Ralph did not object to the issuance of the federal courts' restraining orders being put into effect through the completion of his criminal case. The federal courts' restraining orders provide, in pertinent part:

> "That RALPH L. SCHIPPERS, his agents, attorneys, family members and those persons in active concert or participation with him, and those persons or entities who have any interest or control over the subject property are hereby *restrained, without prior approval of this Court and upon notice to the United States and an opportunity for the United States to be heard, from attempting or completing any action that would affect the availability, marketability, or value of said property,* including but not limited to selling, assigning, pledging, distributing, mortgaging, encumbering, wasting, secreting, depreciating, damaging, or in any way diminishing the value of all or any part of their interest, direct or indirect, in the following property: [Real property located at 6300 SE 6th Avenue, Pleasant Hill, Polk County, Iowa; and Funds held by Fidelity Management Trust Company, Account No.

---

account," but Marla admits that the funds Ralph embezzled were commingled with Marla's funds.

6. Title 18 United States Code section 3613(c) provides that "[e]ntry of a judgment of restitution constitutes a lien in favor of the United States on 'all property and rights to property' of the Defendant." 18 U.S.C. § 3613(c).

215558274, in the name of Ralph L. Schippers]."

[Dkt. No. 2, Page 1, Order No: 4:12–mj–135]; [Dkt. No. 2, Page 1, Order No: 4:12–mj–164.] (emphasis added). As the Iowa district court later recognized in its order *nunc pro tunc* on September 24, 2012, Marla did not receive any interest in the subject properties through Marla and Ralph's divorce decree that was filed on August 23, 2012. The state divorce decree was never intended to grant more than it could.

Furthermore, the Iowa district court did not (and cannot) issue a divorce decree that conflicts with a federal court's restraining order. Moreover, if the divorce decree was formalized by an Iowa court and deemed fair and valid under Iowa law, it would have no effect on this Court's determination that the transfers were invalid under federal law. *See Kirtland*, 2012 WL 4463447, at *16 (citing *United States v. Barrier Industries*, 991 F.Supp. 678, 681 (S.D.N.Y.1998)). As discussed below, the Government may still seek to void a transfer as a fraudulent conveyance even if a divorce decree was adopted as part of a state court judgment. *See United States v. Kirtland*, No. 10–10178–03–WEB, 2011 WL 3624997, at *2 (D.Kan. Aug. 17, 2011). "Pursuant to the Supremacy Clause of Article VI, the FDCPA controls the validity to the transfers of a debtor of the United States …" *Kirtland*, 2012 WL 4463447, at *16.

**4. Marla Lacks a Property Interest in the Subject Properties Under Iowa Law**

■ For purposes of dividing property at divorce, Iowa is known as an "equitable distribution" jurisdiction. *See In re Marriage of Schriner*, 695 N.W.2d 493, 496 (Iowa 2005) (citing *In re Marriage of McNerney*, 417 N.W.2d 205, 207 (Iowa

1987) (citing IOWA CODE § 598.21(1) (1985))). Under Iowa statutory law, there are two tasks in dividing property at divorce. The first task is to determine the property subject to division and the proper valuations to be assigned to the property. *See In re Marriage of Duffield and Pettit*, 819 N.W.2d 426, at *3 (Iowa 2012) (unpublished table decision) (citing *In re Marriage of Schriner*, 695 N.W.2d at 496). The second task is to divide that property in an equitable manner according to the enumerated factors in Iowa Code § 598.21, as well as other relevant factors determined by the court in a particular case. *See Id.; see also* Iowa Code § 598.21 (2009); *In re Marriage of Engelbrecht*, 829 N.W.2d 589, at *8 (Iowa 2013) (unpublished table decision) (citing *In re Marriage of Fennelly*, 737 N.W.2d 97, 102 (Iowa 2007)). Under Iowa law, property transfers in a divorce agreement may be set aside where the transfers are unreasonable, inequitable, and fraudulent. *See, e.g., Travelers Indem. Co.*, 138 N.W.2d at 58.

**a. Property Subject to Division and Separate Property**

■ According to Iowa's Supreme Court, " 'Equitable distribution' essentially means that the courts divide the property of the parties at the time of divorce, except any property excluded from the divisible estate as separate property, in an equitable manner in light of the particular circumstances of the parties." *In re Marriage of Schriner*, 695 N.W.2d at 496. "Iowa … is not a community property state. Rather, it is a state where, as a general statement of the law, a spouse in his or her own right owns property separate from the other spouse." *Nichols*, 526 N.W.2d at 348–49. The Iowa Court of Appeals explained that property a spouse "brings into the marriage is a factor to consider in making an equitable division" upon divorce. *In re Marriage of Allison*,

796 N.W.2d 458, at *3 (Iowa Ct.App.2004) (unpublished table decision). "It is not set aside like inherited property." *Id.* (citing *In re Marriage of Miller,* 552 N.W.2d 460, 465 (Iowa Ct.App.1996)). Instead, separate property brought to the marriage "is a factor to consider, together with all the other circumstances, in making an overall division." *Id.*

In this case, at the time the federal courts' restraining orders were filed in June and July of 2012, the subject properties were Ralph's separate properties based on Iowa law. For example, Ralph owned the marital home as separate property because he bought the home before marriage, and only his name was on the mortgage, the deed, and the title of the marital property. Although Marla alleges she helped contribute to the home's mortgage, she makes no attempt to trace her funds to any payments on the home's mortgage. This is problematic as her monthly earnings were deposited and commingled in one account with funds that Ralph stole from Granger Motors. Ralph also owned the 401–K account prior to marrying Marla, and it was only in his name when the federal courts' restraining orders were filed. For that reason, it too, was Ralph's separate property.

### b. Equitable Distribution and Fraudulent Conveyances

 What constitutes an "equitable distribution" will depend on the circumstances of each case. *See In re Marriage of Engelbrecht,* 829 N.W.2d at *8 (citing *In re Marriage of Hansen,* 733 N.W.2d 683, 702 (Iowa 2007); *In re Marriage of Anliker,* 694 N.W.2d 535, 542 (Iowa 2005)). In other words, a "right" property division in a divorce action is dependent upon the case's facts. *See Bowman v. Bowman,* 259 Iowa 820, 146 N.W.2d 333, 334 (1966). " 'An equitable distribution of marital property, based upon the factors in 598.21(5), does not require an equal division of assets.' " *In re Marriage of McDermott,* 827 N.W.2d 671, 682 (Iowa 2013) (quoting *In re Marriage of Kimbro,* 826 N.W.2d 696, 703 (Iowa 2013)). "Equality is, however, often most equitable; therefore, we have repeatedly insisted upon the equal or nearly equal division of marital assets." *Id.*

Based on Iowa law, there are two common motivations for fraudulent property transfers at divorce, and in such circumstances, the property divisions have been deemed inequitable. The impetus behind such a transfer may be to spite a former spouse. *See, e.g., In re Marriage of Williams,* 421 N.W.2d 160, 164 (Iowa 1988) (noting hostility and animosity accompanied the divorce, there was a temptation for the parties to be less than fair to each other in preserving their marital assets, and the husband's transfer of nearly $500,000 was considered in assessing the property settlement). Or it may be prompted by intent to avoid paying debts to creditors. *See, e.g., Travelers Indem. Co.,* 138 N.W.2d at 58 (setting aside a divorce settlement agreement as it constituted an unreasonable, inequitable, and fraudulent conveyance, where the wife learned that her husband was embezzling from his employer which prompted her to file for a divorce, the husband transferred all his property and assets to his wife, and the husband was rendered insolvent and unable to reimburse his employer).

Here, the motivations underlying the divorce decree are markedly similar to those underlying the divorce settlement agreement in *Travelers Indem. Co.* Like the wife in *Travelers Indem. Co.,* Marla intermingled her motives with Ralph's intent to hinder, delay, and defraud his creditors. This is because Marla sought the majority

of Ralph's assets.[7] At the time Marla and Ralph filed a divorce decree on August 23, 2012, Marla had notice that Ralph intended to defeat his creditors based on their agreement. Presumably, Marla was also aware of the restraining orders filed by two federal judges on Ralph's assets from June and July of that year.

In addition, in *Travelers Indem. Co.*, it was "self-evident" that the husband would "be left insolvent" based on the settlement agreement, and the wife knew her husband was, by the divorce agreement, left with no assets to reimburse his employer. *Id.* at 53. The record also failed to indicate that the trial court—the one that approved the agreement—was aware that the husband would be unable to pay his creditors. *Id.* Likewise, if the divorce decree were effectuated here, Ralph would be left with significantly less assets and unable to pay the debts he owes his creditors. Marla also knew that when the divorce decree matured, it would leave Ralph with only half of his primary assets to reimburse Granger Motors. It also does not appear from the record that the District Court of Dallas County was advised of Ralph's embezzlements, and that Ralph would be left with far less money to reimburse his employer based on the divorce decree that the district court approved on August 23, 2012.

Lastly, the timeline of events in *Travelers Indem. Co.* is analogous to the factual situation in this case. In *Travelers Indem. Co.*, strained domestic relations developed between the husband employee and wife after the husband informed his wife of his embezzlements from his employer, and the wife later sought a divorce.[8] *Id.* at 56. A settlement agreement followed. *Id.*

██ Here, Marla sought a divorce shortly after Ralph informed Marla of his long-standing embezzlements in May of 2012. In fact, at the April 24, 2013 hearing, Marla admitted she obtained a divorce from Ralph based on his embezzlements:

Q: And what were the events leading up to you wanting to get a divorce from Ralph?

A: In May of last year, I got a phone call telling me to come home, and Ralph told me that he had taken money from Granger Motors and that he'd lost his job.

Q: Did you have any knowledge of this leading up to that date?

A: Absolutely none.

These events were followed by the formation of a divorce decree. As the Government explained at the hearing in April of this year: "The divorce, the property settlement, it moved very quickly. Clearly, it was as a result of the crime." The words

7. Even if Marla did not have a fraudulent intent regarding the receipt of the subject properties through the divorce decree, this Court still finds, and it discusses in greater detail below, that the assets she would have received by Ralph's fraudulent transfers should be applied to the money he owes in restitution based on federal law. *Sherrill*, 626 F.Supp.2d at 1275 (citing four cases for the proposition that the intent of the transferee is irrelevant in determining whether a money judgment is appropriate against the transferee).

8. The facts of *Travelers Indem. Co.* are distinct from the present case in that the wife in

*Travelers Indem. Co.* dropped her first divorce action, engaged a new attorney, and filed a new petition for divorce after she was not going to receive more than one-half the assets accumulated during the marriage from the first property settlement agreement. *Travelers Indem. Co.*, 138 N.W.2d at 56. The second settlement agreement provided that *"all assets, real, personal or mixed, be and become the sole property of the wife."* *Id.* Even so, based on the agreements in *Travelers Indem. Co.* and this case, both husbands were left "with little more than [they] possessed the day [they] arrived in this world." *Id.*

of Iowa's Supreme Court provide an apt description of Marla and Ralph's divorce decree: "This agreement was not only unreasonable and inequitable, it reeked of fraud ... We have repeatedly held upon dissolution of marriage a grant to one spouse such as the one here concerned was inequitable, unconscionable, and could not stand." *Id.* at 56–57. This Court is content in finding that Marla and Ralph's divorce decree was unreasonable, inequitable, and fraudulent. The transfers were employed to defeat the rights of Ralph's victims, and therefore, the divorce decree is not valid under Iowa law as it would make and effectuate fraudulent conveyances.

### 5. Marla Lacks a Statutory Dower Interest in the Marital Home

At the April 24, 2013 hearing, Marla's counsel argued, "[Marla] has a statutory interest in the home. She has a dower interest in the home, and when that home is sold, she's required to sign the document for her interest in that home ..." According to Marla's counsel, Marla's "statutory dower interest right ... was awarded to her in [the] divorce decree." The dower right is one basis for giving Marla the one-half interest in the proceeds from the sale of the marital home.

These claims lack merit. This Court was never advised of any specific statute, or language from the divorce decree, in Marla's objections (or at the April 24, 2013 hearing) to support the proposition that Marla has a "statutory dower interest

right" in the net proceeds from the sale of the marital home. After reviewing the relevant statutes, case law, and divorce decree, the Court is unconvinced that Marla has such an interest. To fully understand the weaknesses in this argument it is necessary to determine how a "dower" right arises.

A "dower" right is not to be confused with "dowry" which is "[t]he money, goods, or property that a woman brings to her husband in marriage." Black's Law Dictionary 566 (9th ed.2009). For example, in *Rorem v. Rorem,* a wife "received from her father at the time of her marriage a dowry of $1,500." 244 Iowa 980, 59 N.W.2d 210, 215 (1953). A "dower," at common law, is "a wife's right upon her husband's death, to a life estate in one-third of the land that he owned in fee." BLACK'S LAW DICTIONARY 565 (9th ed.2009). "Of course dower, in the original common law sense, has been abolished in Iowa, but we continue in practice to use the word as meaning the right to the statutory distributive share which the surviving spouse receives." *In re Dluhos' Estate,* 246 Iowa 1043, 70 N.W.2d 549, 553 (1955). "In that statutory distributive share is the right of election [to take a life estate in the entire homestead instead of one-third of the real estate free from debts and expenses]." *Id.* "Common law 'dower' itself was the portion of or interest in real estate which was given the widow *for life.*" *Id.*

A "statutory dower interest," codified in Iowa Code § 633.211,[9] was recently

---

9. Iowa Code § 633.211 is entitled, "Share of surviving spouse if decedent left no issue or left issue all of whom are issue of surviving spouse." IOWA CODE ANN. § 633.211 (West 2009). Section 633.211 provides: "If the decedent dies intestate leaving a surviving spouse and leaving no issue or leaving issue all of whom are the issue of the surviving spouse, the surviving spouse shall receive the

following share: 1. All the value of all the legal or equitable estates in real property possessed by the decedent at any time during the marriage, which have not been sold on execution or by other judicial sale, and to which the surviving spouse has made no relinquishment of right. 2. All personal property that, at the time of death, was, in the hands of the decedent as the head of a family, exempt from

discussed by Iowa courts. *See Freedom Financial Bank,* 805 N.W.2d at 811; *see also MetaBank v. Estate of Boesen,* 810 N.W.2d 532 (Iowa Ct.App.2012) (unpublished table decision). In *Freedom Financial Bank,* the Supreme Court looked back to the early 1900s for a definition of "statutory dower interest": "The dower right, given by statute to a wife in the property of her husband, *though inchoate pending the life of the husband,* is in the nature of a property right, and she cannot be divested of it by any act of her husband, whether done in good faith, or in fraud ..." *Freedom Financial Bank,* 805 N.W.2d at 807 (quoting *Warner v. Trustees of Norwegian Cemetery Ass'n,* 139 Iowa 115, 117 N.W. 39, 42 (1908)) (emphasis added); *see also MetaBank,* 810 N.W.2d at *3 (quoting the same definition from *Warner).* According to the court, Iowa Code § 633.211 "is a codification of the long-held 'general rule of the wife's *inchoate right* in land of which her husband may be seised at any time during the existence of their marriage relation." *See MetaBank,* 810 N.W.2d at *3 (citing *Sullivan v. Sullivan,* 139 Iowa 679, 117 N.W. 1086, 1087 (1908)) (emphasis added); *see also Peddicord v. Peddicord,* 242 Iowa 555, 47 N.W.2d 264, 267 (1951) (noting that during her husband's life, a wife's statutory dower interest "is inchoate and is in the nature of a burden or incumbrance upon the real estate"); *Coomes v. Finegan,* 233 Iowa 448, 7 N.W.2d 729, 733 (1943) (noting that right of dower does not vest until the other spouse's death, subject to payment of the deceased spouse's debts and costs of administration).

 Iowa courts have historically referred to the statutory dower interest in the context of probate law, or where a surviving spouse is claiming an interest in a deceased spouse's property. *See Freedom Financial Bank,* 805 N.W.2d at 807; *see also MetaBank,* 810 N.W.2d 532, at *3. In the absence of a statute to the contrary, to be entitled to dower Marla had to be Ralph's wife at his death. Ralph is not dead. Nor can Marla show that she is a surviving widow as the marriage dissolved. Thus, Marla never held more than an inchoate dower right while married to Ralph—the right never vested. *See Marvin v. Marvin,* 59 Iowa 699, 13 N.W. 851, 851 (1882) ("It appears to us that under our laws it is absolutely essential for plaintiff [the wife] to show that she was decedent's wife at the time of his death and his surviving widow. This cannot be shown because the marriage was dissolved by the decree of divorce"); *see also* Iowa Code §§ 633.210–633.225 (2013); *Bowman v. Bennett,* 250 N.W.2d 47, 51 (Iowa 1977).

 In addition, a divorce terminates the right of dower. *See Nissen v. Nissen Trampoline Co.,* 241 Iowa 474, 39 N.W.2d 92, 98 (1949) (finding that a divorce decree terminated the wife's dower interest in the husband's realty); *see also Hamilton v. McNeill,* 150 Iowa 470, 129 N.W. 480, 482 (1911); *Winch v. Bolton et al.,* 94 Iowa 573, 63 N.W. 330, 331 (1895) ("As the title to the land was in S.F. Winch, the divorced wife has now no claim therein, and it is not necessary to determine whether she signed the power of attorney or not"). As Iowa's highest court explained in a case dating to the late nineteenth century:

> "It seems to us if there be no surviving wife, *as in case of the dissolution of the marriage relation by a decree of divorce,* there can be no distributive share set off. It is a prerequisite to the right that there be a surviving wife. After a di-

execution. 3. All other personal property of the decedent which is not necessary for the

payment of debts and charges." *Id.*

vorce either party may again marry. Suppose in this case the husband had again married and died, leaving his lawful wife surviving him, who would be entitled to the distributive share in his estate? Of course it would be the last wife. There cannot be two surviving wives. At common law "no woman can have dower in her husbands [sic] lands unless the coverture were continuing at the time of his death."

*See Marvin*, 13 N.W. at 851 (emphasis added).

■ A wife's dower right is not terminated upon divorce in certain circumstances, such as where the decree of divorce was obtained by fraud. *See, e.g., Dennis v. Harris*, 179 Iowa 121, 153 N.W. 343, 348 (1915) (finding that "[t]o give [the wife] this [dower] right, however, the marriage must have continued until the time of death, or, if not so continuing, must have been terminated without her fault or in a manner rendering it invalid as against the wife"). In any event, that law does not conflict with the following proposition that has consistently been defended by Iowa's Supreme Court: "A decree of divorce, unassailed, is a complete bar to any claim to dower." *See Id.; see also Hamilton*, 129 N.W. at 482; *Winch*, 63 N.W. at 331; *Boyles v. Latham*, 61 Iowa 174, 16 N.W. 68, 68 (1883); *Marvin*, 13 N.W. at 851. Here, the divorce decree was not procured by fraud. Rather, as discussed below, there were fraudulent transfers made through the divorce decree, which requires that it be set aside. According to the authority cited above, the divorce decree bars Marla from acquiring a dower right to the net proceeds from the sale of the marital home.

■ Finally, an Iowa court of appeals in *MetaBank* held that a dower cannot be allowed where inequitable results would follow. There, the appellate court held that a surviving spouse had no statutory dower interest in a property because her deceased husband failed to pay the purchase price on the home, and therefore, the husband never had the property free and clear. *MetaBank*, 810 N.W.2d 532, at *6 (citing *Sullivan*, 117 N.W. at 1089; *Thomas v. Hanson*, 44 Iowa 651, 653 (1876)). The appellate court was also persuaded by the district court's alternative ground for denying the wife's claim to the property, which was based on the fact that the husband only held the property in trust or as an intermediary for another. *Id.* After reaching the conclusion that the property division was not unfair to the wife, the Iowa court reasoned, "Though dower is favored by the courts, 'it is not to be allowed at the expense *of clearly inequitable results*, unless the statute clearly requires it.'" *Id.* (citing *Sullivan*, 117 N.W. at 1089 (emphasis added)). To allow the wife a statutory dower interest in the property "'free and clear' of Metabank's claim for $3.7 million would ... 'work manifest injustice and wrong.'" *Id.*

It would be inequitable and "work manifest injustice and wrong" to allow Marla to recover a statutory dower interest in the net proceeds from the sale of the marital home because the property transfers in Marla and Ralph's divorce decree were fraudulent. *MetaBank*, 810 N.W.2d 532, at *6. Marla also did not provide the Court with any evidence of her contributions to the home's mortgage although the Court does not doubt that she made some. At the April 24, 2013 hearing, Marla's counsel simply asserted that Marla contributed equally to the household's expenses with marital income. Without more, it is not fair or equitable to reach the conclusion that Marla is entitled to half of the net proceeds from the home's sale. This Court's conclusion is bolstered as the mortgage was paid for by a joint checking

account, including embezzled funds; Ralph purchased the home; the home's title, mortgage, and deed were only in Ralph's name when the restraining orders were filed; and the divorce decree consisted of fraudulent transfers.

### B. Marla's Alternative Claims and Objections Fail Based on Federal Laws

 Next, this Court turns to consider the validity of Marla's alternative claims for the subject properties and objections to this Court's restitution and garnishment orders. As was indicated by the Iowa District Court for Dallas County on September 24, 2012, Marla's interest in the properties is subject to Marla "making a claim for said items in *Federal Court* ..." [Dkt. No. 38–2] (emphasis added). This Court finds that Marla's alternative claims for the subject properties and objections in federal court fail as a matter of law because Marla and Ralph's divorce decree consisted of fraudulent transfers in violation of § 3304(b)(1)(A) and § 3304(b)(1)(B)(ii). In finding that the transfers were fraudulent, this Court holds that the MVRA and the FDCPA require the subject properties to be applied in full to the restitution owed by Ralph.

### 1. Marla Schippers's Arguments

In her objections, Marla does not directly address the specific elements of either 28 U.S.C. § 3304(b)(1)(A) or § 3304(b)(1)(B)(ii) to explain why the transfers to her were not fraudulent. Rather, Marla argues that she and Ralph owned the marital home and contributed equally to its mortgage. [Dkt. No. 5 Page 1, Order No. 4:12–mj–135.] At the April 24, 2013 hearing, Marla's counsel claimed that the proceeds from the home were not "property transferred for the purposes of fraud or to avoid judgment in this matter."

Marla's counsel argued that this case is distinguishable from other cases involving fraudulent transfers because Marla and Ralph lived in the home for over 20 years and this was not a transfer of Ralph's asset. Ralph received one-half of the net proceeds from the sale of the marital home pursuant to the divorce decree.

Additionally, in her objections, Marla contends that during the marriage the contributions taken from Ralph's income, and the company contributions that went to Ralph's 401–K account, are Marla's assets. [Dkt. No. 36 Page 2.] She reiterates to the Court that she is "an innocent spouse" who was wronged by her ex-husband. [Dkt. No. 5 Page 1, Order No. 4:12–mj–135]; [Dkt. No. 36 Page 1.] Marla's counsel further argued at the April 24, 2013 hearing, "This isn't a situation where Mr. Schippers, at the sign of criminal prosecution and potential restitution, got rid of all of their stuff." The attempts by Marla's counsel to distinguish cases involving fraudulent transfers from the facts of this case fall short.

### 2. The Government's Arguments

The Government claims that Ralph's transfers of one-half of the proceeds of the marital home and one-half of Ralph's 401–K account to Marla were fraudulent pursuant to 28 U.S.C. § 3304(b)(1)(A) and § 3304(b)(1)(B)(ii).

First, the transfers were fraudulent pursuant to 28 U.S.C. § 3304(b)(1)(A) because Ralph had an "actual intent to 'hinder, delay or defraud' a creditor" in giving one-half of the proceeds from the sale of the marital home and of the 401–K account. [Dkt. No. 35 Page 5]; [Dkt. No. 38 Page 4.] In its briefs, the Government addressed five of the eleven factors under § 3304(b)(2), making the case that Ralph had an "actual intent to hinder, delay, or defraud" the Government.

Second, the transfers were also fraudulent pursuant to 28 U.S.C. § 3304(b)(1)(B)(ii) because they were "made 'without receiving a reasonably equivalent value in exchange for the transfer' and the Defendant 'believed or reasonably should have believed that he would incur debts beyond his ability to pay as they became due.'" [Dkt. No. 35 Page 6.] Ralph did not receive "anything of value"—e.g., property or money—in return for giving Marla half of the subject properties. [Dkt. No. 35 Page 6]; [Dkt. No. 38 Page 6.]

### 3. Fraudulent Transfers Under Sections 3304(b)(1)(A) and 3304(b)(1)(B)(ii)

■ As noted above, the FDCPA (28 U.S.C. §§ 3001–3308) applies to this case. Congress imported the FDCPA's procedures into the MVRA, making the FDCPA's procedures for collecting debts available for certain crimes, such as "any offense committed by fraud or deceit." *See* 18 U.S.C. § 3663A; *see also Kollintzas,* 501 F.3d at 801 (quoting *Mays,* 430 F.3d at 966); *Walston,* 2011 WL 3876932, at *3. The FDCPA enables the Government to seek relief from fraudulent transfers and to collect criminal debts owed to the Government. *See United States v. Loftis,* 607 F.3d 173, 176 (5th Cir.2010); *see also In re Phillips & Hornsby Litig'n,* 306 F.Supp.2d at 634; *Kelley v. College of St. Benedict,* 901 F.Supp.2d 1123, 1130 (D.Minn.2012). The Attorney General has delegated his authority to collect criminal debts to the local U.S. Attorneys. *See United States v. Boal,* 534 F.3d 965, 966 n. 1 (8th Cir.2008) (citing 28 C.F.R. § 0.171). "Debt" is defined as money owed to the Government on account of restitution. *See* 28 U.S.C. § 3002(3)(B); *see also United States v. Gelb,* 783 F.Supp. 748, 752 (E.D.N.Y.1991). In this case, Ralph's restitution order in the amount of $1,433,825.37 is a debt that is owed to the Government.

The FDCPA forbids debtors from avoiding obligations to the Government by fraudulently transferring assets. *See United States v. Mitria,* No. 05 CR 438, 2008 WL 244297, at *2 (N.D.Ill. Jan. 25, 2008). The FDCPA includes provisions that allow avoidance of transfers based on *actual fraud* and *constructive fraud. See In re Walter,* 462 B.R. 698, 705 (Bankr. N.D.Iowa 2011); *see also In re Porter,* 2009 WL 902662, at *21. In the case at bar, the Government utilizes both avenues under § 3304(b)(1): it argues that Ralph committed *actual fraud* in violation of § 3304(b)(1)(A) and *constructive fraud* in violation of § 3304(b)(1)(B)(ii). *See Morris,* 2012 WL 3292900, at *4.

Section 3304(b)(1)(A) provides, in relevant part, that "a transfer made or obligation incurred by a debtor is fraudulent as to a debt to the United States, whether the debt arises before or after the transfer is made or the obligation is incurred, if the debtor makes the transfer or incurs the obligation *with actual intent to hinder, delay, or defraud a creditor'.*" 28 U.S.C. § 3304(b)(1)(A) (also sets forth eleven factors to be considered in determining actual intent under subsection (b)(2)) (emphasis added). A "creditor" is defined to mean "any person who offers or extends credit creating a debt or to whom debt is owed." 15 U.S.C. § 1692a(4). Here, the Government is the creditor, and the debt was incurred once Ralph's criminal proceeding commenced. *See Kirtland,* 2012 WL 4463447, at *14 (quoting *Walston,* 2011 WL 3876932, at *3) (for purposes of the FDCPA, the government becomes a creditor when it acquires "a right to payment, even though the right was not reduced to judgment at the time of the transfers").

Section 3304(b)(1)(B)(ii) provides, in relevant part, that "a transfer made or obligation incurred by a debtor is fraudulent as to a debt to the United States, whether the debt arises before or after the transfer is made or the obligation is incurred, if the debtor makes the transfer or incurs the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation if the debtor ... *intended to incur, or believed or reasonably should have believed that he or she would incur debts beyond his or her ability to pay as they became due.*" 28 U.S.C. § 3304(b)(1)(B)(ii) (emphasis added).

 Put simply, as explained by the District Court for the Middle District of Georgia in *United States v. Sherrill,* "the thrust of § 3304(b)(1)(A) is the intent of the debtor to hinder, delay, or defraud the United States as creditor." 626 F.Supp.2d at 1272. By contrast, "the gravamen of § 3304(b)(1)(B) is the making of the transfer without receiving a reasonably equivalent value in exchange when the transfer would reasonably be expected to cause the debtor to incur debts beyond his ability to pay them as they become due." *Id.*

 Unlike the defendant in *United States v. Malek,* who met the requirement of actual intent to defraud a creditor by admitting under oath that she made the transfers and agreed to a divorce as part of a plan to protect her property and not lose ownership of it, no evidence was presented by the Government that Ralph made statements under oath indicating an actual intent to defraud a creditor. *See United States v. Malek,* No. 06–cr–118–bbc, 2008 WL 5428185, at *4 (W.D.Wis. Dec. 31, 2008); *see also Barrier Industries, Inc.,* 991 F.Supp. at 679. Rather, as noted above, the Government offered other indicia of intent based on an analysis of five of the eleven factors under § 3304(b)(2). Actual intent to defraud need not be proven in order to establish that a fraudulent conveyance occurred. *See United States v. Kramer,* No. 3:05–cv–97, 2007 WL 642940, at *3 (D.N.D. Feb. 26, 2007). Indicia or circumstantial evidence, if proven by clear and convincing evidence, can be sufficient to establish intent to defraud. *Id.* Moreover, when proving the transferor's intent is difficult, courts allow an inference of fraud by considering the non-exclusive factors in § 3304(b)(2), often referred to as "badges of fraud."[10] *Id.*

This Court analyzes whether Ralph acted with "actual intent" to defraud the Government based on some of the factors under § 3304(b)(2).[11] *See Sherrill,* 626

---

10. These factors are nearly identical to the "badges of fraud" codified in state statutes governing the determination of a debtor's intent to defraud. *United States v. Holt,* 664 F.3d 1147, 1150 n. 2 (8th Cir.2011) (citing *In re Addison,* 540 F.3d 805, 813–14 n.11 (8th Cir.2008)).

11. "Intent," as contemplated by § 3304(b)(1), may be inferred upon consideration of all relevant factors, which include, but are not limited to, whether: (A) the transfer or obligation was to an insider; (B) the debtor retained possession or control of the property transferred after the transfer; (C) the transfer or obligation was disclosed or concealed; (D) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (E) the transfer was of substantially all the debtor's assets; (F) the debtor absconded; (G) the debtor removed or concealed assets; (H) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (I) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; (J) the transfer occurred shortly before or shortly after a substantial debt was incurred; and (K) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor. 28 U.S.C. § 3304(b)(2).

F.Supp.2d at 1273 (noting that "[a]lthough § 3304(b)(2) permits the Court to consider other factors, it does not require the Court to do so") (citing *Fed. Trade Comm'n v. Nat'l Bus. Consultants, Inc.*, 376 F.3d 317, 321 n. 7 (5th Cir.2004)). After conducting an analysis of the relevant FDCPA provisions below, this Court finds that Ralph had an actual intent to defraud, and therefore, concludes that the conveyances Ralph made to Marla were fraudulent under § 3304(b)(1)(A).[12]

Also, because many of the factors relevant to each of the two provisions at issue—28 U.S.C. § 3304(b)(1)(A) and § 3304(b)(1)(B)—are the same, this Court addresses them together. *Sherrill*, 626 F.Supp.2d at 1271. The factors under § 3304(b)(2) are relevant to whether Ralph transferred the subject properties without receiving fair value in exchange, and if the transfers placed him in a position that made it more difficult for him to pay his debts as they became due. This court also finds that Ralph's conveyances were fraudulent under § 3304(b)(1)(B)(ii).

#### a. Transfer to an Insider: Section 3304(b)(2)(A)

Under the FDCPA, a "transfer" is defined as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance." 28 U.S.C. § 3301(8). The definition of an "insider" includes "a relative of the debtor," such as a spouse or family member. 28 U.S.C. § 3301(5). The FDCPA defines "relative" as "an individu-al related, by consanguinity or adoption, within the third degree as determined by the common law, a spouse or an individual so related to a spouse within the third degree as so determined." 28 U.S.C. § 3001(5).

The Government alleges that Ralph "transferred" one half of his 401–K account and the proceeds of the marital home to his then-wife, Marla, through their divorce decree. The Government contends that Marla qualifies as an "insider." This is because Marla was Ralph's wife at the time the two agreed to the terms of their divorce decree. [Dkt. No. 24 Page 9.]

For the sake of argument, this Court must consider the fact that Marla is now Ralph's ex-spouse. At the time Marla and Ralph consented to and signed their divorce decree on August 23, 2012, Marla and Ralph effectively divorced. Therefore, the argument could be made that Marla was not an "insider" at the time of the transfer because she was not Ralph's spouse or relative at the time the transfers came into effect.

In *Malek*, a married couple filed for divorce under the belief that the divorce and subsequent transfers would prevent the confiscation or forfeiture of their property by their creditors. The federal district court in *Malek* held that Nancy Malek's husband was an "insider" by definition under 28 U.S.C. § 3301(5)(A)(i) because Farrokh Malek was Nancy's husband at the time of the transfers, which were made as part of their marital settlement agreement. *Malek*, 2008 WL 5428185, at *4. Nancy transferred to Far-

---

**12.** The Government analyzes factors (A), (D), (E), (I), and (J) under § 3304(b)(2) in its resistance to Marla's objection to the restitution order of the proceeds from the home's sale, and in its response to Marla's objection to the garnishment of the 401–K account. This Court also considers factor (H) under 28 U.S.C. § 3304(b)(2). Courts have focused on only these six factors in determining whether a transfer was fraudulent. *See, e.g., Midgett*, 2006 WL 517661, at *2.

rokh all of her rights, title, and interest in valuable assets of the marital estate, including her interest in a Bella Vista property, a 2003 Lexus, the proceeds of the sale of their Four Winns boat in the amount of $6,500, and any bank accounts not in her name. *Id.* at \*4. These transfers were made as part of their marital settlement agreement. *Id.* Ultimately, the federal district court determined that Malek intended to defraud the victims and the United States by transferring the assets to her husband. *Id.* at \*7.

Here, the record demonstrates that Ralph gave Marla one-half interests in the subject properties. The divorce decree consisted of direct payments of money and releases of interests in the properties, which constitute "transfers" for purposes of the FDCPA. *See Forbes,* 740 F.Supp.2d at 341. The fact that Marla was named on the divorce decree as a recipient of a half interest in the properties indicates she could have acquired some kind of "right" in the properties, for the purpose of transferring the properties. However, based on the Iowa district court's order *nunc pro tunc* Marla's right never attached. *See In re Phillips & Hornsby Litig'n,* 306 F.Supp.2d at 637. Also, like the facts in *Malek,* Ralph transferred property to Marla when Marla was "an insider" by definition under 28 U.S.C. § 3301(5)(A)(i) as Marla was Ralph's wife. Marla and Ralph negotiated the terms of the divorce decree before it became final. Based on the timeline of events, it would appear that Ralph intended to defraud his victims and the United States by transferring assets to Marla through a divorce decree within weeks after his primary assets were restrained by the Government.

### b. The Threat of Suit: Section 3304(b)(2)(D)

The Government brought no legal action against Ralph before Marla and Ralph's divorce decree was filed on August 23, 2012. However, based on the circumstances, there was a sufficient threat of legal action before the transfers were made for this factor to weigh in favor of finding a fraudulent conveyance. *See Sherrill,* 626 F.Supp.2d at 1273. Similar to the transferor in *Sherrill,* who knew the SEC was "on his trail," Ralph was aware that the Government was "on his trail" when Granger Motors fired Ralph on May 18, 2012, or at the latest, once the Government restrained Ralph's key assets in June and July of 2012. *Id.* at 1274.

Furthermore, Ralph and Marla could anticipate that the Government would take legal action against him. Ralph and Marla could also anticipate that Ralph's employer, Granger Motors, would take legal action in order to retrieve the money Ralph embezzled. *See, e.g., Malek,* 2008 WL 5428185, at \*4 ("[T]he undisputed facts make it obvious that a reasonable person in [defendant's] position would have anticipated that Meriter [the plaintiff] would take legal action to recoup the money she [the defendant] had stolen.") As in *Malek,* where the defendant and her husband had reason to believe that they would be sued after the defendant was terminated from her employment, Ralph's transfers to Marla occurred shortly after Marla learned that Ralph was terminated from his employment, and they had reason to believe they would be sued. *Id.* Thus, at the time the divorce decree was filed, Ralph was sufficiently aware of a "threat of suit" such that this factor weighs against Ralph in favor of finding fraudulent intent on Ralph's behalf. *See Sherrill,* 626 F.Supp.2d at 1273.

### c. Substantially All of Debtor's Assets: Section 3304(b)(2)(E)

The Government contends that Ralph transferred substantially all of his assets

to Marla. [Dkt. No. 35 Page 5]; [Dkt. No. 38 Page 5.] The record supports this contention. One can quickly glean from Ralph's Presentence Investigation Report ("PSIR") that Ralph's only unencumbered assets are the net proceeds from the sale of a home he purchased and his retirement account. [Dkt. No. 35 Page 5]; [Dkt. No. 38 Page 5]. Hence, in consideration of Ralph's other assets and liabilities, Ralph gave away more than one-half of his assets to Marla through their marital settlement agreement.

In *Holt*, the Eighth Circuit Court of Appeals noted that the defendant transferred $43,540 to her boyfriend knowing he would invest that money in a home solely owned by him. 664 F.3d at 1151. Holt's largest asset was a $65,000 savings account, the remains of a March 2008 insurance settlement resulting from a fire that destroyed her home. *Id.* at 1149. After the transfer, Holt had $21,460, or 33.015% of her largest asset. The Eighth Circuit did not provide Holt's total net worth at that time or other assets. However, based on the facts provided, the Eighth Circuit held that the defendant transferred "substantially all her cash assets." *Id.* at 1151.

Here, it is true that Ralph gave one-half of the sales proceeds of the marital home to Marla. The net proceeds from the sale of the home were $38,766.96, and so, Marla received $19,383.48. In addition, Ralph gave one-half of his retirement account to Marla. The retirement account consisted of $85,862. Therefore, Marla received $42,931. [Dkt. No. 24 Pages 11–12.] In total, Ralph and Marla individually received $62,314.48 from the division of the subject properties that were solely owned by Ralph at the time the properties were restrained. The proceeds from the sale of the home and Ralph's 401–K account were his largest assets. Ralph was also awarded the "right, title and interest in and to

the 2008 Aspen vehicle," whereas Marla continued to lease "a 2012 Mini Cooper." [Dkt. No. 38–1 Pages 2–3.] The 2008 Chrysler Aspen is worth $17,786, but the liabilities on the vehicle totaled $20,119.

In addition, Ralph and Marla were "awarded any bank accounts, retirement accounts, IPERS accounts, or any other assets they may have in the [sic] own respective names, free and clear of any claim of the other party." [Dkt. No. 38–1 Page 3.] At the time Ralph's PSIR was made on January 7, 2013, Ralph had $200.00 in cash, $47.88 in a personal checking account, and $19.73 in a personal savings account. However, Ralph's credit card liability totaled $23,670.55 at the time his PSIR was finalized. According to the divorce decree, the parties "equitably divided their furniture, furnishings, appliances and personal property." [Dkt. No. 38–1 Page 3.] Yet, the divorce decree does *not indicate with specificity how these belongings were divided.*

After subtracting Ralph's total liabilities from his car and credit card account ($26,-003.55) from what Ralph kept after the divorce decree ($62,314.48), Ralph is left with $36,310.93, or 36.7% of his total net worth. As indicated by Ralph's PSIR, without the transfers to Marla, Ralph's total net worth would be $98,893.08. [Dkt. No. 24 Page 12.] Ralph's net worth consists primarily of his largest two assets— that is, the proceeds from the marital home and his retirement fund. [Dkt. No. 24 Pages 11–12.] Based on *Holt*, this Court concludes that the transfers were substantially all of Ralph's assets. This Court's conclusion is bolstered because Ralph was aware that his embezzlements had been uncovered by the FBI, and Ralph's assets were restrained in June and July of 2012. It was also only a brief time until Ralph admitted guilt and realized that his assets were going to pay restitu-

tion. In essence, Ralph knew he had nothing at the time he negotiated a divorce settlement agreement with Marla. Thus, the transfers weigh in favor of finding fraudulent intent under 28 U.S.C. § 3304(b)(1)(A), and a finding that the transfers hindered Ralph's ability to pay his debts as they became due in violation of 28 U.S.C. § 3304(b)(1)(B)(ii). *See Sherrill,* 626 F.Supp.2d at 1275; *see also Moore,* 156 F.Supp.2d at 246.

### d. Value of the Consideration: Sections 3304(b)(2)(H) and 3304(b)(1)(B)(ii)

The Government makes the case that Ralph did not receive "anything of value" in return for giving his wife one-half of the sales proceeds of the marital home and one-half of Ralph's 401–K account. [Dkt. No. 35 Page 6]; [Dkt. No. 38 Page 6.] This is true. Ralph kept one-half of his retirement account, one-half of the proceeds from the sale of the marital home, the 2008 Chrysler Aspen vehicle, $200.00 in cash, and funds from his checking and savings accounts. However, Ralph's assets—aside from his 401–K account and the proceeds from the sale of the marital home—were nominal when taking into consideration Ralph's preexisting liabilities. Moreover, Ralph's primary assets were his 401–K account and the proceeds from the sale of the marital home. After reviewing Ralph's PSIR, it does not appear that Ralph received anything in return for half of his primary assets. He did not receive even a small fraction of what he transferred to Marla. *See Kirtland,* 2012 WL 4463447, at *16. Similar to the defendant in *United States v. Kincaid,* Ralph knew he was incurring debts beyond his ability to pay based on the transfers. *See Kincaid,* 2011 WL 6329613, at *10; *see also* 28 U.S.C. § 3304(b)(1)(B)(ii). Ralph was also aware that his assets were gone; he knew everything he possessed would be taken by the Government.

Love and affection or emotional benefit would not help Marla's case here. *See Moore,* 156 F.Supp.2d at 246 n. 2 ("Any intangible, emotional benefit is not included within the meaning of reasonable equivalent value because [w]ithin the meaning of the statute, value means economic value." (alteration in original) (internal quotation marks omitted)); *see also United States v. Vancampen,* Nos. Civ.A. 95–1436–FGT, Civ.A. 95–1453–FGT, 1997 WL 873537, at *4 (D.Kan. July 9, 1997). Rather, the value of the consideration received by the debtor is determined from the economic perspective of the creditor. *See Kirtland,* 2012 WL 4463447, at *14 (citing *In re Hinsley,* 201 F.3d 638, 643–44 (5th Cir.2000)). This Court must focus on the net effect of the transfer to the debtor's estate. *Loftis,* 607 F.3d at 177. From the perspective of Ralph's creditors, Ralph's transfers to Marla reduced Ralph's estate without any corresponding economic improvements or value in the funds available to Ralph's creditors. Thus, this factor weighs in favor of finding fraudulent intent for purposes of § 3304(b)(1)(A) and § 3304(b)(1)(B)(ii). *See Kirtland,* 2012 WL 4463447, at *16 (citing *Morris v. Vansteinberg,* No. 01–15474, 02–515, 2003 WL 23838125, at *4 (D.Kan. Nov. 26, 2003)) ("[T]he uncontroverted facts establish that the transfers occurred without an exchange for reasonably equivalent value. Again, the court considers the exchange free from considerations of love and spousal support which might govern state domestic relations law"); *see also Loftis,* 607 F.3d at 176–77.

### e. Insolvency at the Time of or Shortly After the Transfers: Section 3304(b)(2)(I)

A debtor is "insolvent" under 28 U.S.C. § 3302(a) "if the sum of the debtor's debts is greater than all of the debtor's assets at

a fair valuation," and the debtor is "presumed insolvent if he fails to pay his debts as they become due." 28 U.S.C. § 3302(a); *see also Lightfoot v. Miss Lou Properties, Inc.*, No. 05–3776–PB–SS, 2006 WL 4029569, at \*5 (E.D.La. Sept. 1, 2006) (citing *United States v. Lombardi*, 924 F.Supp. 361, 363 (D.R.I.1996) (citing 28 U.S.C. § 3304(a)(1))). The statute provides, "the debtor was insolvent *or* became insolvent shortly after the transfer was made or the obligation was incurred." 28 U.S.C. § 3304(b)(2)(I) (emphasis added).

On September 17, 2012, one month and four days after Marla filed a petition for dissolution of marriage, Ralph pleaded guilty to embezzling funds from Granger Motors. Restitution was set at $1,433,825.37 on January 17, 2013. Ralph's liabilities far exceeded his assets after the subject properties were transferred to Marla. According to Ralph's PSIR, Ralph's total net worth ($98,893.08), minus his transfers to Marla ($62,314.48), resulted in $36,578.6 remaining for Ralph. [Dkt. No. 24 Page 12.] Even if Ralph were to give his remaining assets to the Government today, he is still $1,397,246.77 in debt to the Government.[13] Ralph's liabilities exceeded his assets both before and after the transfers of the subject properties; Ralph was no doubt insolvent after he made the transfers to Marla.[14] *See Malek*, 2008 WL 5428185, at \*4. Therefore, § 3304(b)(2)(I) weighs in favor of invalidating the transfers as fraudulent. *See Sherrill*, 626 F.Supp.2d at 1274 (finding that the defendant was insolvent after the transfers, and it weighed in favor of finding that the transfers were fraudulent under both § 3304(b)(1)(A) and § 3304(b)(1)(B), but the defendant's liabilities exceeded his assets both before and after the transfers of the subject properties).

### f. The Transfer of Subject Properties Occurred Shortly Before the Incurrence of a Substantial Debt: Section 3304(b)(2)(J)

Ralph transferred one-half of his interest in the subject properties by a divorce decree on August 23, 2012. On September 17, 2012, Ralph admitted to embezzling funds when he pleaded guilty to wire fraud under 18 U.S.C. § 1343, and restitution was ordered on January 17, 2013. Thus, the transfers occurred *shortly before* Ralph incurred a substantial debt when he pleaded guilty and was ordered to pay restitution. *See* 28 U.S.C. § 3304(b)(2)(J); *see also United States v. Becker*, No. 4:03 CV 1602 DDN, 2005 WL 6120994, at \*12 (E.D.Mo. Sept. 25, 2005). Ralph should have reasonably believed he was incurring debts beyond his ability to pay after he embezzled from his employer, and transferred assets to Marla. *See* 28 U.S.C. § 3304(b)(1)(B)(ii); *see also Loftis*, 607 F.3d at 177–78. Thus, the factor weighs in favor of finding Ralph had a fraudulent intent in transferring the properties.

### g. Conclusions

As noted above, some federal courts have been reluctant to find that a transfer-

---

**13.** This figure does not take into account Ralph's monthly expenses or income since his PSIR was filed on January 7, 2013. However, according to Ralph's PSIR, his total monthly cash flow is $641.00. [Dkt. No. 24 Page 12.] Therefore, even if Ralph saved all of his excess cash flow since January, he would only have $5,769 in savings. Thus, he is still significantly in debt to the Government.

**14.** According to Ralph's judgment, his restitution order is in an amount of $1,433,825.37. Therefore, Ralph was rendered insolvent based on the transfer of the subject property to Marla, and the debt he owes. As a result of Ralph's criminal conduct, Granger Motors lost $924,265.37 and Universal Underwriters Insurance Company lost $509,560.00. [Dkt. No. 24 Page 14.]

or acted with intent to "hinder, delay, or defraud a creditor" as a matter of law.[15] Conversely, other federal courts have held that a defendant transferred property with "actual intent to hinder, delay, or defraud a creditor" where "badges of fraud" existed under § 3304(b)(2).[16] In considering the factors under § 3304(b)(2), Ralph acted with the intent to "hinder, delay, or defraud" the Government's collection of money owed by Ralph. Thus, this Court finds that the transfers were fraudulent under § 3304(b)(1)(A), and they must be set aside. *See Malek,* 2008 WL 5428185, at *4 (citing *U.S. ex rel. Hartigan v. Alaska,* 661 F.Supp. 727, 729–30 (N.D.Ill.1987)) ("[T]he dissolution of marriage 'was certainly never intended to be a vehicle to effect a fraudulent end, or to transmute that which would otherwise be fraudulent into something lawful' ").

■ In addition, Ralph did not receive an equivalent value for the transfers. *See Loftis,* 607 F.3d at 177 ("Reasonably equivalent value means that 'the debtor has received value that is substantially comparable to the worth of the transferred property' ") (quoting *BFP v. Resolution Trust Corp.,* 511 U.S. 531, 114 S.Ct. 1757, 1766, 128 L.Ed.2d 556 (1994)). Rather, the transfers hindered Ralph's ability to pay his debts, and he "believed or reasonably should have believed he would incur debts beyond his ability to pay as they became due." 28 U.S.C. § 3304(b)(1)(B)(ii). Accordingly, even if there is not *actual fraud under* § 3304(b)(1)(A), this Court finds

---

**15.** *See, e.g., Kirtland,* 2012 WL 4463447, at *15 (finding that although many § 3304(b)(2) factors suggest an intent to defraud, the court did not hold that the government was entitled to summary judgment as "finding that a party has acted with an actual intent to defraud under the FDCPA is available only in rare cases," but held government was entitled to avoid transfers as fraudulent based on §§ 3304(a) and (b)(1)(A)) (citing *Vernor,* 2005 WL 3465847, at *4 and *In re Phillips & Hornsby Litig'n,* 306 F.Supp.2d at 639); *United States v. Pritchett,* 2011 WL 197763, at *6 (finding it could not state, as a matter of law, that judgment was appropriate under § 3304(b)(1)(H) nor did the government succeed under § 3304(b)(1)(B) in proving transfers were not for a reasonably equivalent value); *see also Forbes,* 740 F.Supp.2d at 343 (finding constructive, not actual fraud, based on the presence of "badges of fraud").

**16.** *See, e.g., Morris,* 2012 WL 3292900, at *7 (finding that given the factual record the factors set out in § 3304(b)(2) tilt in favor of the defendant as to the brother's intent to hinder, delay, and defraud the United States as to the property in dispute, and the "transfer of the Property from the Brother to the Plaintiff was, in fact, fraudulent, as a matter of law"); *see also Walston,* 2011 WL 3876932, at *3 (finding that since the defendant had actual intent to defraud the United States, the transfers were fraudulent under § 3304(b)(1)(A)); *White–Sun Cleaners Corp.,* 2011 WL 1322266,

at *14 (finding defendant had actual intent to hinder, delay, or defraud the United States as a creditor based on the factors under § 3304(b)(2)); *In re Porter,* 2009 WL 902662, at *21 (finding sufficient evidence to conclude defendant made the transfer with an actual intent to hinder, delay, or defraud his creditors and several "badges of fraud" existed under § 3304(b)(2)); *Sherrill,* 626 F.Supp.2d at 1274 (finding that when you combine an analysis of pertinent factors under § 3304(b)(1)(A) with testimony of defendant's own attorney that "he was contemplating ways to avoid potential creditors," it is clear that defendant "made the transfers to hinder and delay the United States's [sic] collection" of restitution owed by defendant); *Midgett,* 2006 WL 517661, at *2 (finding based on the same six factors analyzed by this Court that the transfer was fraudulent under § 3304(b)(1)(A)); *Barrier Industries, Inc.,* 991 F.Supp. at 681 (finding defendant transferred farm property with actual intent to hinder Government's ability to collect on defendant's impending debt); *Teeven,* 862 F.Supp. at 1215 (finding defendant had actual intent to hinder creditors and noting "by the terms of the statute, a Court may find that the debtor possessed an actual intent to hinder, delay, or defraud the creditor, when transferring assets, by the mere fact that the transfers were made to relatives of the transferor").

that the conveyances were still *constructively fraudulent* under § 3304(b)(1)(B)(ii). *See Sherrill,* 626 F.Supp.2d at 1274.

### h. Other Considerations

According to Ralph's PSIR and Marla's testimony at the hearing on April 24, 2013, it appears clear to this Court that the divorce was motivated by Ralph's criminal conduct. [Dkt. No 24 Page 9.] In addition, Marla may have had absolutely no knowledge of Ralph embezzling money from his employer until he lost his job. To that extent, she may be an innocent party "who has been victimized by the crimes committed by her ex-husband." [Dkt. No. 36 Page 1.] It is not unreasonable to assume Marla minimized contributions to her retirement account to free up funds for the couple,[17] and Marla helped pay for the mortgage and other housing expenses. For that, this Court sympathizes for Marla's situation. Ralph shoulders great remorse, guilt, and responsibility for how his actions hurt his wife. Understandably, he wants her to have something.

Despite these considerations, this Court is persuaded that the factors it analyzed under § 3304(b)(2) above weigh in favor of finding that the transfers Ralph made to Marla were fraudulent under § 3304(b)(1)(A) and § 3304(b)(1)(B)(ii). In addition, Ralph concedes that the embezzled funds were used "to purchase goods and services for himself and his family, including international airline tickets, hotel accommodations, dining expenses, golf-related items, and jewelry." [Dkt. No. 24 Page 6.] At the April 24, 2013 hearing, Marla testified:

Q: Mrs. Schippers, when you bought jewelry at Joseph's, you bought expensive jewelry, correct?

A: I mean, I bought nice jewelry. I don't know if I would call it very expensive, but it was nice.

Q: Diamond jewelry?

A: Yes.

Q: And you bought multiple pieces?

A: Yes.

Marla's counsel brought to this Court's attention that one piece of Marla's jewelry was worth $7,000, but argued that Marla never paid the full amount on a purchase as the pieces she purchased came with trade-ins of scrap gold and other items. Marla also bought expensive clothing; she went on vacation trips with Ralph; and she paid for her daughter's wedding. As the Government argued at the hearing on April 24, 2013, "Certainly Mrs. Schippers enjoyed the benefit of that [embezzled] money as well." This is especially true given the fact Marla earns $1,500 a month as a paraeducator at a middle school. [Dkt. No. 24 Page 9.] Marla indicated that she previously worked at Des Moines Public Schools, and she has been self-employed cleaning houses, but the Court was provided no evidence of Marla's prior earnings.

Additionally, Marla admitted that she paid for jewelry and clothing using funds from a joint checking account—the account that included funds that Ralph stole from Granger Motors. Marla testified about her expenditures and the joint banking account on April 24, 2013:

Q: Now, did your salary [$1,500 a month] cover all your expenditures at Von Maur and Joseph's and the other stores that you shopped at?

A: Because my check went in with his check, we just—*it was all together.*

Thus, the embezzled funds were commingled with the marital assets during the twenty-year marriage. Marla and Ralph

---

**17.** Marla testified at the April 24, 2013 hearing that she has an IPERS, or prefunded retirement fund, with approximately $18,000 in it.

were married on December 16, 1992. [Dkt. No. 24 Page 8.] Ralph began embezzling funds from Granger Motors 5 years and 1 month later in January of 1998. For almost fifteen years of the marriage, or nearly seventy-five percent of the marriage, Marla benefited from her husband's criminal conduct. Marla also indicated that she shared a joint bank account with Ralph, and they both deposited checks into that account. The couple used the embezzled funds for living expenses, or purchases for their routine expenses. Ralph was also able to build up the value of his retirement account and the marital residence because of the embezzled funds. Based on the foregoing additional reasons, this Court concludes that the transfers Ralph made to Marla were fraudulent, and must be set aside.

## C. Remedies and Good Faith Defense Under Section 3307(a)

The FDCPA provides the Government with "a host of remedies when seeking to collect a debt from a debtor who has fraudulently transferred property." *See* 28 U.S.C. §§ 3001, 3304; *see also United States v. Billheimer,* 197 F.Supp.2d 1051, 1056 (S.D.Ohio 2002). "Under 28 U.S.C. § 3306(a), the United States may obtain the following remedies as a result of a fraudulent transfer: '(1) avoidance of the transfer or obligation to the extent necessary to satisfy the debt to the United States; (2) a remedy under this chapter against the asset transferred or other property of the transferee; or (3) any other relief the circumstances may require.' " 28 U.S.C. § 3306(a). The United States may recover judgment for the value of the asset transferred if the transfer is voidable under 28 U.S.C. § 3306(a)(1), but the recovery cannot exceed the judgment on a debt. "The judgment may be entered against—(1) the first transferee of the asset or the person for whose benefit the

transfer was made; or (2) any subsequent transferee, other than a good faith transferee who took for value or any subsequent transferee of such good-faith transferee." *See* 28 U.S.C. § 3307(b); *see also Sherrill,* 626 F.Supp.2d at 1274–75.

 As noted above, § 3307(a) provides a defense to "a person who took in good faith and for a reasonably equivalent value ..." 28 U.S.C. § 3307(a). However, the facts make it clear that Marla is not protected by the good faith defense under § 3307(a). Similar to the facts in *United States v. Kirtland,* Marla was aware of Ralph's legal and financial situations at the time the divorce decree was negotiated. 2012 WL 4463447, at *16. Marla, comparable to the wife in *Kirtland,* paid close to nothing for the transfers of real and personal property in the divorce decree, and therefore, Ralph did not receive a reasonably equivalent economic return for the properties. Courts have consistently rejected the argument that a property settlement incorporated in a state divorce judgment automatically satisfies the § 3307(a) defense absent a showing that the divorce itself was procured by fraud. *See, e.g., Barrier Industries,* 991 F.Supp. at 681 (citing *U.S. ex rel. Hartigan,* 661 F.Supp. at 729–30 and *United States v. Mongelli,* 857 F.Supp. 18, 20–21 (S.D.N.Y.1994) as examples of courts that previously rejected this argument). Thus, this Court finds that Marla was not a "good faith transferee who took for value," and Marla is not entitled to the defense under 28 U.S.C. § 3307(a). *See Sherrill,* 626 F.Supp.2d at 1275 n. 8.

 Because the good faith defense under 28 U.S.C. § 3307(a) does not apply to Marla, this Court turns to examine the specific procedures for collecting on criminal fines or restitution orders provided under 18 U.S.C. § 3613(c):

"[A]n order of restitution made pursuant to sections 2248, 2259, 2264, 2327, 3663, 3663A, or 3664 of this title, is a lien in favor of the United States on all property and rights to property of the person fined as if the liability of the person fined were a liability for a tax assessed under the Internal Revenue Code of 1986." [18]

18 U.S.C. § 3613(c). Section 3613 makes clear that an order of restitution, such as Ralph Schipper's restitution order, is to be treated as a tax liability or tax lien under the MVRA. *See United States v. Hosking,* 567 F.3d 329, 335 (7th Cir.2009); *see also Kollintzas,* 501 F.3d at 802; *United States v. Beulke,* 892 F.Supp.2d 1176, 1181 (D.S.D.2012). Therefore, if delinquent taxpayers cannot protect their pension benefits, or proceeds from the sale of their marital home, from the IRS, then criminals owing a fine may not protect the same assets from the government. *See United States v. Irving,* 452 F.3d 110, 125 (2nd Cir.2006) (finding ERISA pension plans are not exempted from payment of criminal fines); *see also Kirtland,* 2012 WL 4463447, at *12 (finding that a government lien may include the proceeds from the marital home, but noting in this case that the government did not include in its motion the transfer of the ownership interest in the marital home, valued at $535,000 with liens of approximately $355,000, as the ownership interest was liquidated and the government's lien had been released); *United States v. Ramona Cunningham,* 866 F.Supp.2d 1050, 1058–59 (S.D.Iowa 2012) (finding defendant's pension plan not exempt from garnishment for payment of restitution); *United States v. Rice,* 196 F.Supp.2d 1196, 1201 (N.D.Okla.2002) (noting Congress did not intend pension benefits to be exempt from execution under § 3613).

■ A federal court, pursuant to the MVRA, is required to order a convicted criminal defendant to make restitution. *See* 18 U.S.C. § 3663(a)(1)(A); *see also Becker,* 2005 WL 6120994, at *4. As discussed above, "[t]he MVRA provides the Government authority to enforce victim restitution orders in the same manner that it recovers fines and by all other available means." 18 U.S.C. § 3664(m)(1)(A)(i, ii). The FDCPA's procedures are incorporated into the MVRA, and it ensures that the Government has a civil cause of action when a debtor fraudulently transfers property, such as here, after a debt is incurred. *See* 28 U.S.C. § 3304. In view of that, this Court orders that the proceeds from the marital home, and Ralph's 401–K account, be paid to Granger Motors and Universal Underwriters Insurance Company. *See Kirtland,* 2012 WL 4463447, at *12.

## IV. DISPOSITION

In sum, Marla Schippers has no ownership interest in the subject properties based on the facts and legal proceedings before and after the filing of her divorce decree. The transfers in the divorce decree are also voided as they were unreasonable, inequitable, and fraudulent under state and federal law. *See* 28 U.S.C. §§ 3304; 3306 (transfers that are fraudulent as to a debt to the United States may be voided); *see also Travelers Indem. Co.,* 138 N.W.2d at 58.

Upon the forgoing, **IT IS ORDERED** that Marla's requests that the Court direct the Clerk of Court to release her alleged one-half interest in the proceeds from the

---

**18.** The order of restitution in Ralph's criminal case falls within at least two sections of Title 18 § 3613—namely, § 3663(a)(3) (order of restitution agreed to in a plea agreement), and § 3663A(c)(1)(A)(ii) and § 3663A(c)(1)(B) (order of restitution involving an offense against property in which an identifiable victim or victims suffered pecuniary loss).

sale of the marital home, and Ralph's 401–K account, are DENIED. The transfers of the subject properties in the divorce decree are set aside and may be avoided "to the extent necessary to satisfy the debt to the United States." 28 U.S.C. § 3306(a)(1). The properties will be applied in full to the restitution Ralph owes his victims, Granger Motors and Universal Underwriters Insurance Company.