NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0191n.06

Nos. 17-4045/17-4047/19-3182

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **FILED** |
|  | ) | Apr 02, 2020 |
| Plaintiff-Appellee, | ) | DEBORAH S. HUNT, Clerk |
|  | ) |  |
|  | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
|  | ) | COURT FOR THE |
| ILEANA OSBORNE, et al., | ) | NORTHERN DISTRICT OF |
|  | ) | OHIO |
| Defendant-Appellant. | ) |  |
|  | ) |  |

BEFORE: ROGERS, KETHLEDGE, and LARSEN, Circuit Judges.

ROGERS, Circuit Judge. Following an August 2015 conviction for bank fraud and a $29 million restitution sentence, Ileana Osborne conveyed her one-half interest in a Florida home to her ex-husband, Samuel Osborne, for $100. In a 2012 divorce decree, Ileana also transferred to Samuel her interest in a lawsuit involving the Florida home. The Government alleged that these transfers were fraudulent under the Federal Debt Collection Procedures Act ("FDCPA"). The district court granted summary judgment in favor of the Government. Because a genuine issue of material fact remains as to whether the Florida home lacked a net positive value at the time of the conveyance—and thus whether it did not constitute an "asset" within the reach of the FDCPA—defendants are entitled to a trial on that claim. The same cannot be said, however, of Ileana's right to recover in the Florida lawsuit, which is indisputably an "asset" under the FDCPA, and which Ileana transferred with actual intent to defraud. The district court therefore properly granted

summary judgment for the Government on that claim. The district court also correctly dismissed Samuel's equitable contribution claims on the basis of the unclean hands doctrine. Finally, defendants' request to reassign this case to a different district judge on remand is without merit.

## I.

In the early 2000s, Ileana Osborne began developing real estate in the panhandle region of Florida. She partnered with investor and real estate developer Jack Coppenger to recruit clients from Ohio who were interested in buying Florida property. Starting in 2004, Ileana and Coppenger began a scheme to commit bank fraud. The scheme involved the use of straw buyers to obtain inflated mortgage loans that would fund real estate purchases at an amount vastly exceeding the asking price. After paying closing costs and a kickback to the straw buyer, Ileana and Coppenger would pocket the difference. Ileana and Coppenger would make payments on the mortgages for a short period and then allow the loans to default. This went on for two years and led to more than $29 million in losses for the banks. Things were going well for Ileana, who, with her then-husband Samuel Osborne, purchased a $1.5 million home on Driftwood Point Road in Santa Rosa Beach, Florida ("the Driftwood property").

In 2006, however, one of the straw buyers sued Ileana and Coppenger in Ohio state court, alleging mortgage fraud. The Ohio court entered judgment against Ileana for nearly $1.7 million in December 2009. By then, Ileana was on the FBI's radar. FBI agents interviewed Ileana and Samuel in April 2009 and advised them that they were persons of interest in the investigation of a large-scale mortgage fraud scheme perpetrated by Coppenger. Federal agents interviewed Ileana again in 2011 at the U.S. Attorney's Office in Cleveland, Ohio, this time under the terms of a proffer agreement.

In January 2012, the Osbornes filed for divorce in Okaloosa County, Florida. The final divorce decree was entered less than two months later in March 2012. The Osbornes agreed to share parental rights and responsibilities and split custody of their children 50/50. The divorce decree also divided up the marital estate. Ileana received a minivan, a one-half interest in the Driftwood property, and two bank accounts worth a total of $129,500. Samuel received four vehicles, a boat worth $200,000, Ileana's consulting company, a $4.3 million civil judgment the Osbornes had obtained against Coppenger, and $141,700 in cash. Samuel also received a $2.7 million judgment against Ileana for the debt she had incurred as a result of her scheme with Coppenger. Samuel assumed responsibility for mortgage payments, utilities, and maintenance associated with the Driftwood property.

The divorce decree also transferred to Samuel Ileana's interest in a civil lawsuit (hereinafter the "Florida lawsuit") filed in Florida state court against Walton County, Florida, as well as several engineering firms and developers. The Florida lawsuit, originally brought by Samuel along with three of his neighbors, alleged that a recently built subdivision nearby was causing substantial flooding, reducing the value of the properties in the Driftwood Estates subdivision. Ileana was later added to the lawsuit in 2010. The divorce decree stated that "the parties have pending litigation against developer for damages to their home. The Husband is solely entitled to collection of damages should the outcome be favorable. The Wife waives any interest she may have now or in the future to any portion of same."

Federal prosecutors indicted Ileana in December 2013, charging her with 45 counts of bank fraud and conspiracy to commit bank fraud. Ileana signed a plea agreement in June 2014. On August 27, 2015, Ileana was sentenced to 38 months' imprisonment and ordered to pay restitution of over $29 million. Four days after she was sentenced, Ileana executed a quitclaim deed,

transferring her interest in the Driftwood property to Samuel for $100. On September 8, 2015, the district court entered a final judgment in Ileana's criminal case, amending her sentence to 32 months' imprisonment and reincorporating the $29 million restitution amount.[1]

In June 2016, the United States sued Ileana and Samuel Osborne under the Federal Debt Collection Procedures Act ("FDCPA"), alleging both actual and constructive fraudulent transfer of the Driftwood property in violation of 28 U.S.C. § 3304. The Government later amended its complaint, adding a second claim relating to Ileana's transfer of her interest in the Florida lawsuit in 2012. By this time, the Florida lawsuit had settled against the county defendant, resulting in a $1 million settlement. Had she not transferred her interest in the lawsuit, Ileana's portion of the settlement would have been $120,000. Samuel filed counterclaims, arguing that if the Government wins, it should also have to share in the costs of maintaining the Driftwood property and prosecuting the Florida lawsuit.

Following discovery, the United States moved for summary judgment on its affirmative claims and on Samuel's counterclaims. The Osbornes opposed the motions in separate responses, and each filed cross motions for summary judgment as to the Driftwood property claim (count one). In their cross motions, the Osbornes argued that Ileana did not fraudulently convey the Driftwood property because it had a negative net worth and thus its conveyance was not a "transfer" under the FDCPA. "Transfer" is defined in the FDCPA as "disposing of or parting with an *asset* or an *interest in an asset*." 28 U.S.C. § 3301(6) (emphasis added). In turn, "asset" is defined as "property of a debtor," but expressly does not include "property to the extent it is encumbered by a valid lien." *Id.* § 3301(2). As of August 2015, the Driftwood property had a

---

[1] Ileana's co-conspirator, Jack Coppenger, was prosecuted separately. He was sentenced to a term of 97 months and assessed $35 million in restitution.

mortgage balance of approximately $939,000.[2] The parties appeared to agree on this much but put forth competing calculations of the property's worth. The Osbornes claimed the property was worth only $875,000, as demonstrated by an appraisal the Osbornes conducted one month prior to Ileana's conveyance. The appraisal was done for purposes of the Florida lawsuit. There was also evidence in the record showing that the Osbornes, who had listed the property for sale, rejected a purchase offer of $906,000. There is no indication of when the offer was made other than that it was before June 2016. On the other hand, the Government argued that the Driftwood property was worth $1.55 million, which was the property's listing price at the time of Ileana's conveyance.[3] In the alternative, the Government pointed to the fact that the house was appraised for $1 million one year later in August 2016.[4]

Before the conclusion of summary judgment briefing, the defendants filed a joint motion to disqualify the presiding district judge under 28 U.S.C. §§ 144 and 455. Defendants asserted that, prior to seeing any evidence, the district judge "formed a belief that he was deceived at Ms. Osborne's sentencing hearing by her, her counsel and Mr. Heath, her attorney in a Florida lawsuit." Defendants drew the court's attention to a scheduling conference early in the case during which

---

[2] There is conflicting evidence in the record showing that the mortgage balance was $923,000. The district court relied on the $939,000 amount in its opinion. The question of which amount is correct does not appear to make a difference regarding whether the property was fully encumbered.

[3] The parties tangled over the admissibility of this evidence, but only after summary judgment had already been decided. In support of its summary judgment motion, the Government presented an affidavit from the realtor who listed the Osbornes' property, who stated that "[b]ased upon discussions members of my sales team had with the Osbornes and our knowledge of Florida real estate market values, on or about June 3, 2015, we mutually agreed to list the property for sale at a price of $1,550,000.00. We agreed that this was a good price to start marketing the home." The affidavit goes on to state that "[a]lthough we were unable to sell the property, the initial list price was a reasonable price to begin our marketing efforts in the August/September 2015 timeframe." Four months after this evidence was presented, and one month after the district court ruled on summary judgment, the Osbornes filed a joint motion to strike the evidence on the basis that it was inadmissible hearsay and had been improperly raised for the first time in the Government's reply brief. The district court denied the defendants' motion as untimely.

[4] This appraisal was also introduced for the first time in the Government's reply brief and was also the subject of defendants' untimely motion to strike.

they allege the district judge appeared upset that he had not been notified of Ileana's transfer or otherwise been given an explanation. Defendants claimed that during the conference, the district judge requested extraneous information about who orchestrated the conveyance and who had deceived him. For instance, the judge asked for the names of the notary, witnesses, or preparer of the deed that Ileana had created. Also at the hearing, the district judge referred to the Osbornes' defense as "very interesting" and mentioned that it will be a "difficult case" for the defendants to prove.

According to defendants, the district judge continued to express dismay about what he saw as a lack of candor by Ileana and her counsel during the sentencing hearing in the criminal case. At a later status conference in the civil case, the district judge addressed defendants' counsel as follows:

> Did anyone give notice to the government and suggest to the government that "We are going to be making certain transfers and we're doing so not in an attempt to evade restitution here, but we are doing so for the following reasons, and we want you to know this. We're telling you up front, so that we don't have potential problems either before sentencing or after sentencing."
>
> . . . .
>
> Wait a minute. Sorry, sir. You can't have it both ways. You knew that she was pending sentencing here. We've just heard from you about the fact that you're well aware of the criminal proceedings here, what's transpiring, what's going on. It's a very simple question. Did anyone advise the government or the court, or when I say the court, through the PSI, and say, "You know, we are contemplating making these transfers. We're going to make these transfers. We want you to understand why. We're not doing it in any way, shape or form to evade any potential problems with regard to restitution." In fact, Mrs. Osborne had, what, how many millions of dollars worth of judgment outside of the criminal case that were also pending up in state court here, right?

Defendants also claimed that the district judge improperly advocated for the Government by encouraging the Government to amend its complaint to include a new claim against the defendants and to file a motion to disqualify Samuel's counsel. Finally, the defendants pointed to one of the

court's orders on Samuel's motion to appear by phone at a status conference, in which it accused Samuel of lying to the court about his scheduling conflicts in order to avoid appearing at the hearing in person.

This conduct, defendants argued, occurred in part because of an "acrimonious history" between the district judge and Ileana's lawyer, Craig Weintraub. The district judge had previously investigated Mr. Weintraub for publicly cursing at opposing counsel in his courtroom during a sentencing hearing. The result of the investigation was a public rebuke of Mr. Weintraub by the district judge, who claimed that Weintraub's testimony before the court was "disingenuous" and "lack[ed] candor." The judge ultimately chose not to hold Mr. Weintraub in contempt but did file a complaint against him with the local bar association.

In an August 2017 order, the district court granted the Government's motion for summary judgment on both counts in the complaint, denied the defendants' cross motions for summary judgment on count one, and denied defendants' joint motion to disqualify the district judge.

In granting summary judgment for the Government on counts one and two, the district court concluded that Ileana had transferred her interests in the Driftwood property and Florida lawsuit "with actual intent to hinder, delay, or defraud a creditor" in violation of 28 U.S.C. § 3304(b)(1)(A). The court applied the so-called "badges of fraud" in 28 U.S.C. § 3304(b)(2), a non-exhaustive list of eleven factors courts may consider as indicia of fraudulent intent.[5] Of the

---

[5] The "badges of fraud" in 28 U.S.C. § 3304(b)(2) are as follows:
(A) the transfer or obligation was to an insider;
(B) the debtor retained possession or control of the property transferred after the transfer;
(C) the transfer or obligation was disclosed or concealed;
(D) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
(E) the transfer was of substantially all the debtor's assets;
(F) the debtor absconded;
(G) the debtor removed or concealed assets;

eleven factors, the court found that six applied to the transfer of the rights to the Florida lawsuit and seven applied to the conveyance of the Driftwood home.  In particular, the court held that Ileana had not received "reasonably equivalent value" in return for her transfers.  Regarding the Driftwood property, the court accepted the Government's valuation over that of the defendants and thus concluded that "the property had a value exceeding the $100 paid by Samuel at the time of transfer."  The court likewise concluded that Ileana's right to recover damages in the Florida lawsuit had value and that, when looking at the divorce decree on its face, Ileana had received far less in return.

The court held in the alternative that the Government had proven constructive fraudulent transfer under § 3304(b)(1)(B).  Constructive fraudulent transfer exists when the debtor (1) transfers an asset without receiving reasonably equivalent value in return and (2) "intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due."  28 U.S.C. § 3304(b)(1)(B).  The district court in its "badges of fraud" analysis had already determined that Ileana received less than reasonably equivalent value for the assets she transferred.  In addition, the court found that Ileana "reasonably believed that she would have to pay a large restitution debt to the Plaintiff at the time both transfers were made."  There was thus no genuine issue of material fact as to whether Ileana had committed constructive fraud by transferring her assets.

---

(H) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(I) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(J) the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(K) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

The district court quickly disposed of the defendants' cross motions for summary judgment on count one, rejecting their argument that the Driftwood property did not qualify as an "asset" under the terms of the FDCPA. In doing so, the court relied on its earlier reasoning that Ileana had not received reasonably equivalent value for her transfer of the Driftwood property because the property's value at the time of the transfer exceeded $100. According to the court, this necessarily meant that the Driftwood property had a value above the amount owed on the mortgage. The court also observed that the defendants had not cited any binding Sixth Circuit case law on the issue.

The district court also denied the defendants' motion to disqualify the presiding district judge; the court relied upon two grounds. First, the motion was untimely because defendants waited at least a month after they had become aware of the alleged disqualifying conduct. The court relied on *In re Big Rivers Electric Corp.*, which held that a motion to disqualify must be made "'at the earliest possible moment' after obtaining information of possible bias." 213 B.R. 962, 972 (Bankr. W.D. Ky. 1997) (quoting *In re Cooke*, 160 B.R. 701, 704 (Bankr. D. Conn. 1993)).

The court also denied the motion on the merits. The court defended its conduct at the scheduling conference as "appropriate and necessary to facilitate the efficient progress of the litigation as required by Rule 16." The court further held that none of the defendants' allegations "stem[med] from an extrajudicial source" as required under Sixth Circuit law. Nor in the district court's view was there evidence sufficient to trigger the "pervasive bias" exception to the "extrajudicial source" doctrine. The court pointed to the numerous instances in which it had granted defendants' motions for extension of time, motions to reschedule hearings, and motions to conduct hearings by telephone. The court also explained that its suggestion to the defense attorney

that he recuse himself resulted from the attorney's expressed intention to testify at trial in violation of the "lawyer-as-witness" rule.

The Osbornes timely appealed the district court's rulings contained in its August 2017 order. Those appeals were stayed pending adjudication of Samuel's counterclaims.

In a later order issued in June 2018, the district court granted summary judgment in favor of the Government on Samuel's counterclaims. The court first noted that Samuel failed to point to any statute that would entitle him to contribution from the Government and that he instead relied purely on equitable principles. But because Samuel was a party to the previously-determined fraudulent transfers of Ileana's interests in the Driftwood property and Florida lawsuit, Samuel had "unclean hands" and thus could not avail himself of an equitable remedy. Samuel had been present during the law enforcement interviews with Ileana dating back to 2011 and therefore was aware of the strong likelihood that her assets would be at risk of collection by the Government. The court also rejected Samuel's argument that the Government steps into Ileana's shoes and subjects itself to common law contribution. Rather, the court held, the Government is merely a lienholder with a security interest in Ileana's property. Thus, Samuel must seek contribution from Ileana, not the Government.

The Osbornes moved for reconsideration under Federal Rule of Civil Procedure 59, which the district court denied in pertinent part. The Osbornes timely appealed the order denying their motion for reconsideration. The Osbornes' three appeals (Nos. 17-4045, 17-4047, and 19-3182) have been consolidated.

## II.

Summary judgment for the Government was not warranted on count one—fraudulent transfer of the Driftwood property. There were disputed issues of fact regarding whether the

Driftwood property had a negative net value at the time Ileana conveyed it and, accordingly, whether the conveyance was fraudulent under the FDCPA.

The FDCPA, codified in 28 U.S.C. §§ 3301-3308, provides a mechanism for the enforcement of restitution orders by preventing fraudulent transfers of property. Section 3304 of the statute states in pertinent part:

> **(b) Transfers Without Regard to Date of Judgment**.—
>
> **(1)** Except as provided in section 3307, a transfer made or obligation incurred by a debtor is fraudulent as to a debt to the United States, whether such debt arises before or after the transfer is made or the obligation is incurred, if the debtor makes the transfer or incurs the obligation—
>
> > **(A)** with actual intent to hinder, delay, or defraud a creditor; or
> >
> > **(B)** without receiving a reasonably equivalent value in exchange for the transfer or obligation if the debtor—
> >
> > > **(i)** was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
> > >
> > > **(ii)** intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

The term "transfer" is defined in the FDCPA as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an *asset* or an *interest in an asset*, and includes payment of money, release, lease, and creation of a lien or other encumbrance." 28 U.S.C. § 3301(6) (emphasis added). In turn, "asset" is defined as "property of a debtor," but expressly does not include "property to the extent it is encumbered by a valid lien." *Id.* § 3301(2).

As § 3304(b)'s text indicates, the government must first show that the debtor made a "transfer," which does not occur if the subject property is encumbered by a valid lien. Once this is shown, the government may prove that the transfer was fraudulent in one of two ways: first, by demonstrating "actual intent" or second, by showing constructive intent to defraud, where an insolvent debtor makes a transfer "without receiving a reasonably equivalent value in exchange."

*Id.* § 3304(b)(1)(A), (B).   The statute expressly enumerates eleven non-exhaustive factors that indicate a debtor's actual intent.   *See id.* § 3304(b)(2) and n.6, *supra*.   One of these factors is whether the debtor received reasonably equivalent value in exchange for the asset transferred.   *Id.* § 3304(b)(2)(H).   Thus, the lack of "reasonably equivalent value" in exchange for a transfer is both a factor in determining actual intent as well as a requirement for constructive intent.   *See id.* § 3304(b)(1)(B), (b)(2)(H).

On appeal, the Government accepts that it must demonstrate that the Driftwood property was unencumbered at the time it was conveyed in order to qualify as an "asset" under the FDCPA. Therefore, the dispute between the parties boils down to whether the Driftwood property was worth more than what was left on the mortgage at the time Ileana transferred the property in August 2015.

The defendants presented sufficient evidence to create a genuine issue of material fact that the Driftwood property had a negative net value in August 2015.   In holding otherwise, the district court relied on evidence that the Osbornes had listed the property for a price of $1.55 million in the summer of 2015.   In the alternative, the court found that the Driftwood property was worth $1 million based on an appraisal from June 2016.[6]   1The court acknowledged the defendants' evidence that the Driftwood property was appraised for $875,000 around the time of Ileana's conveyance and that this amount was less than the $939,000 left on the mortgage.   These facts present a genuine issue of material fact.

---

[6] The defendants complain on appeal that these pieces of evidence were submitted by the Government in its reply brief as opposed to its initial motion for summary judgment.  However, as there is sufficient evidence of a factual dispute, it is not necessary to decide whether these items of evidence were properly admitted for purposes of plaintiff's burden at summary judgment.

It may certainly be argued, as the lower court and the Government do, that the appraisal was conducted for purposes of the Florida lawsuit in state court where Samuel had an interest in proving his home had been greatly devalued. But such an argument is not appropriate at the summary judgment stage. *See FDIC v. Jeff Miller Stables*, 573 F.3d 289, 295 (6th Cir. 2009) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)).

The rules governing summary judgment generally prohibit a court from weighing evidence or evaluating a witness's credibility. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). While there are exceptions to this prohibition on credibility determinations, none applies here. This is not, for example, a case where a party's self-serving affidavit contradicts prior sworn testimony. *See United States ex rel. Compton v. Midwest Specialties*, 142 F.3d 296, 303 (6th Cir. 1998). Nor is it a case where a witness's testimony is so implausible that "no reasonable person would believe it." *Hanson v. Madison Cty. Det. Ctr.*, 736 F. App'x 521, 537 (6th Cir. 2018) (quoting *Seshadri v. Kasaian*, 130 F.3d 798, 802 (7th Cir. 1997)). The defendants' appraiser had not given prior sworn testimony. Moreover, the appraisal was done by a licensed Florida appraiser with nearly thirty years of residential real estate appraisal experience. The Government does not challenge the appraisal's methodology, nor does it question the appraiser's professional integrity. Further, the evidence that the Osbornes received a $906,000 offer to purchase the property at an unspecified time before June 2016 is certainly not enough to render the August 2015 appraisal implausible. If anything, evidence that the appraisal was off by just 3% would help validate it.

The appraisal from June 2016—nine months after Ileana's conveyance—was also not conclusive evidence that the Driftwood property had a net positive value. Although the FDCPA does not expressly provide the date on which a property's value is to be measured, we have held that in determining whether "reasonably equivalent value" was given to a transferor under the

analogous Michigan Uniform Fraudulent Transfer Act,[7] "the critical time is when the transfer is 'made.'" *In re Chomakos*, 69 F.3d 769, 770-71 (6th Cir. 1995) (quoting *In re Morris Commc'ns NC, Inc.*, 914 F.2d 458, 466 (4th Cir. 1990)); *accord Valley City Steel, LLC v. Liverpool Coil Processing, Inc.*, 336 F. App'x 531, 534 (6th Cir. 2009) (interpreting Ohio's fraudulent transfer statute). Indeed, on appeal, the Government appears to concede that the relevant date for determining the value of the Driftwood property is August 2015 and does not argue that the June 2016 appraisal is relevant evidence.

In sum, summary judgment in favor of the Government was not warranted because there remained genuine issues of material fact as to whether the Driftwood property was encumbered by a valid lien and thus whether it qualified as an "asset" under the FDCPA. For the same reason, there is a genuine issue of material fact regarding whether Ileana received "reasonably equivalent value" for purposes of constructive fraud under § 3304(b)(1)(B).

The Government finally has failed to put forward a statutory basis for coming to a different decision on equitable grounds such as the defendants' conceded intent to defraud and the fact that the Driftwood property has increased in value since Ileana's conveyance in August 2015. The Government claims that the court's equitable power comes from § 3307 of the FDCPA, which allows the United States to obtain a judgment against a transferee who has received fraudulently transferred property.[8] Section 3307 provides, in relevant part, as follows:

---

[7] The FDCPA is very similar to the Uniform Fraudulent Transfer Act (UFTA), which has been adopted in a majority of states. *Compare, e.g.*, 28 U.S.C. § 3304, *with* UFTA § 4; *see* Collier on Bankruptcy, ¶ 548.01[2][a][i] (16th ed.). The FDCPA is also similar to parts of the bankruptcy code. *Compare* 28 U.S.C. § 3304, *with* 11 U.S.C. § 548. Consequently, courts have found interpretations of the UFTA and bankruptcy code to inform the meaning of the FDCPA. *See In re Walter*, 462 B.R. 698, 706 (Bankr. N.D. Iowa 2011) (collecting cases). For example, we have recognized that cases applying the "reasonably equivalent value" provision in comparable state fraudulent transfer statutes as well as the bankruptcy code are applicable to cases brought under the FDCPA. *See United States v. Goforth*, 465 F.3d 730, 736 & n.7 (6th Cir. 2006).

[8] At oral argument, the Government asserted that § 3308 of the FDCPA also provides authority for an equitable adjustment. That section provides that "principles of law and equity . . . shall apply to actions and proceedings under

**(b) Limitation**.—Except as provided in subsection (d), to the extent a transfer is voidable in an action or proceeding by the United States under section 3306(a)(1) [which allows for voiding of transfers necessary to satisfy a debt to the United States], the United States may recover judgment for the value of the asset transferred, but not to exceed the judgment on a debt. The judgment may be entered against—

> **(1)** the first transferee of the asset or the person for whose benefit the transfer was made; or

> **(2)** any subsequent transferee, other than a good faith transferee who took for value or any subsequent transferee of such good-faith transferee.

**(c) Value of Asset**.—
For purposes of subsection (b), the value of the asset is the value of the asset at the time of the transfer, *subject to adjustment as the equities may require*.

(emphasis added). According to the Government, the language "subject to adjustment as the equities may require" in § 3307(c) "permits courts to accommodate economic realities to prevent wrongdoers from benefitting from their fraudulent behavior."

As an initial matter, it is questionable whether the equitable adjustment argument is properly before us.[9] Assuming that it is, the argument lacks merit. The FDCPA's language and structure do not support the Government's broad reading of § 3307(c). First, § 3307(c) permits the court to adjust the value of an "asset," which, as discussed above, is limited to property not encumbered by a valid lien. *See* 28 U.S.C. § 3301(2). Section 3307(c) would therefore appear to be inapposite here, where there are triable issues of fact as to whether the Driftwood property qualifies as an "asset." It does not matter, as the Government contends, that Ileana acted with

---

this subchapter." 28 U.S.C. § 3308. This argument was not raised until oral argument and accordingly has been forfeited. *See United States v. Jackson*, 918 F.3d 467, 493 (6th Cir. 2019) (citing *United States v. Goldston*, 906 F.3d 390, 395 n.1 (6th Cir. 2018)).

[9] The Government did not raise the issue of an equitable adjustment until its reply brief below. [*See* R. 92, PageID #2082.] As a result, the equitable adjustment argument was not responded to below and the district court did not address it. In general, "[a]rguments raised only in reply, and not in the original pleadings, are not properly raised before the district court, and so are not properly preserved for appeal." *Travelers Prop. Cas. Co. of Am. v. Hillerich & Bradsby Co.*, 598 F.3d 257, 275 (6th Cir. 2010). Defendants, however, do not point out the Government's failure to properly raise the issue below and otherwise fail to respond to the Government's argument on appeal.

fraudulent intent; the FDCPA's asset requirement is separate from the requirement that a debtor act with "actual intent to hinder, delay, or defraud a creditor." *See* 28 U.S.C. §§ 3301, 3304(b)(1); *cf. Peltz v. Moretti*, 292 F. App'x 475, 481 & n.3 (6th Cir. 2008) (observing the same with respect to Ohio's version of the UFTA). In short, the equitable adjustment in § 3307(c) does not empower courts to disregard the FDCPA's threshold asset requirement.

This reading is bolstered by the nature of § 3307(c)'s surrounding provisions. The remedial character of § 3307(b) suggests that the equitable adjustment in § 3307(c) is limited to preventing inequities that might occur *after* the elements of a fraudulent transfer have already been proven. Section 3307(b) provides that the government may recover a judgment for the value of an asset transferred "to the extent a transfer is *voidable* in an action or proceeding by the United States under section 3306(a)(1)." (emphasis added). Similarly, § 3306(a)(1), which is referred to in § 3307(b), is purely remedial and may be invoked only when the United States seeks "relief against a transfer."

The equitable adjustment in § 3307(c) thus operates in situations, unlike this one, where a debtor has committed a substantive violation of the statute and the court is then tasked with formulating a fair remedy. For example, courts have stepped in to prevent the violator from receiving a windfall, such as when interest has accrued on his or her fraudulently transferred funds. This was the factual scenario in the two cases cited by the Government that applied § 3307(c). *See United States v. Chen*, No. 2:10-cv-128, 2010 WL 5315915, at *6 (D. Nev. Dec. 20, 2010); *United States v. Walston*, No. 07-cr-580-5, 2011 WL 3876932, at *4 (N.D. Ill. Aug. 31, 2011). Courts interpreting identical language in state fraudulent transfer statutes have likewise recognized that the purpose of the equitable adjustment is to forestall unfairness resulting from changes in the value of an asset after it has been fraudulently transferred. *State ex rel. Hill v. Lawson*, 128 N.E.3d

471, 474-75 (Ind. Ct. App. 2019) (discussing parallel provision in Indiana's version of the UFTA); *United States v. Verduchi*, 434 F.3d 17, 21-24 (1st Cir. 2006) (same as to Rhode Island's version of the UFTA).

Courts should interpret grants of equitable power by Congress in harmony with a statute's text and legislative scheme. *See Meghrig v. KFC W., Inc.*, 516 U.S. 479, 487-88 (1996); *United States v. Philip Morris USA, Inc.*, 396 F.3d 1190, 1199-1200 (D.C. Cir. 2005). Consistent with this principle, we have previously held that bankruptcy courts—traditionally imbued with broad equitable powers—may not use those powers to "contravene specific provisions of the Bankruptcy Code." *In re Terex Corp.*, 984 F.2d 170, 173 (6th Cir. 1993) (citing *United States v. Energy Res. Co.*, 495 U.S. 545, 549-50 (1990)). As the FDCPA does not prohibit conveyances of encumbered property—and there is a dispute of fact regarding whether the Driftwood property was so encumbered—the district court is not empowered to void Ileana's conveyance solely on the basis that it was done with fraudulent intent.

The Government relies upon *In re Davis*, 911 F.2d 560, 562 (11th Cir. 1990), which held that a creditor could recover property that had been fully encumbered at the time it was transferred by the debtor because the debtor had transferred the property with the intent to defraud. *In re Davis*, however, applied § 727 of the bankruptcy code, which, in contrast to the FDCPA, does not have an independent asset requirement. *See* 11 U.S.C. §§ 101(54)(D), 727(a). Moreover, the court in *In re Davis* did not purport to rely on an equitable adjustment similar to the one in 28 U.S.C. § 3307(c).

## III.

The defendants cross-moved for summary judgment below, arguing not only that summary judgment should be denied for the Government but that defendants should get summary judgment

as to the Driftwood property claim. Defendants fail to adequately present this argument on appeal, choosing to bury it within their discussion of why the district court improperly granted summary judgment for the Government. Defendants assert that all of the Government's evidence as to the value of the Driftwood property is inadmissible. But, as the Government notes, defendants did not move to strike this evidence until four months after the evidence was presented and one month after the district court had issued its order granting summary judgment. Defendants therefore cannot blame the district court for considering this evidence at summary judgment. Nor did the district court abuse its discretion when it later denied defendants' motion to strike as untimely.

Because the Government's competing valuations of the property were properly considered, there were genuine issues of material fact regarding the Driftwood property's value and thus whether it was a transferable asset under the FDCPA. The district court therefore correctly denied summary judgment for defendants on count one.

**IV.**

The district court properly granted summary judgment in favor of the Government on count two regarding fraudulent transfer of Ileana's rights to the Florida lawsuit. There is no genuine issue of material fact that Ileana "transferred" her interest in the lawsuit as that term is defined in the FDCPA and that she did so with actual fraudulent intent.

The defendants do not dispute that litigation rights are "assets" under the FDCPA. Nor could they, as "asset" is defined in the statute as "property of a debtor," which in turn includes "choses in action." *See* 28 U.S.C. §§ 3301(2), 3002(12). In contrast to the Driftwood property, which was mortgaged, there has been no contention that Ileana's interest in the Florida lawsuit was encumbered.

Defendants also do not contest the district court's overall finding that Ileana acted with actual fraudulent intent. The district court determined that six out of eleven "badges of fraud" listed in § 3304(b)(2) applied to the transfer of the litigation rights: Ileana had made a transfer to an insider; the transfer had been concealed; there was a threat of suit prior to the transfer; Ileana did not receive reasonably equivalent value in return; Ileana was insolvent; and the timing of the transfer indicated an intent to defraud. Defendants argue only that Ileana received reasonably equivalent value but make no argument as to the other badges of fraud. Although badges of fraud are not conclusive, "a concurrence of several badges will always make out a strong case." *United States v. Leggett*, 292 F.2d 423, 427 (6th Cir. 1961) (citation omitted). The district court's conclusion that six badges of fraud apply (only one of which defendants dispute) is sufficient to establish Ileana's actual fraudulent intent.

Defendants are mistaken when they assert that "[i]n order to prevail on summary judgment upon Count Two, the government was required to present, among other proofs, undisputed evidence that Ileana did not receive 'reasonably equivalent value' for the domestic relations court's transfer of her right to receive proceeds from the Florida Lawsuit." While "reasonably equivalent value" is a necessary element of *constructive* fraud, *see* 28 U.S.C. § 3304(b)(1)(B), it is only one of many possible indicators of *actual* fraud, *see* 28 U.S.C. § 3304(b)(1)(A), (b)(2). The Government has alleged both types of fraud in this case.[10] Thus, even assuming the district court ruled incorrectly on whether Ileana received reasonably equivalent value for her transfer, the

---

[10] The Government's complaint merely seeks relief under "28 U.S.C. § 3304 *et seq.*" and does not invoke the specific subsection applying to actual and constructive fraud. Nevertheless, the district court underwent an analysis of both types of claims and the defendants do not make any argument that either actual or constructive fraud has been inadequately pled.

remaining badges of fraud identified by the district court are sufficient to support a finding of actual fraudulent intent under 28 U.S.C. § 3304(b)(1)(A).

Defendants argue separately that voiding the divorce decree's transfer of Ileana's rights in the Florida lawsuit would violate principles of federalism, including the *Rooker-Feldman* doctrine and preclusion law. This argument is also without merit.

The *Rooker-Feldman* doctrine plainly does not apply in this case, as the United States was not a party to the state-court divorce proceeding. The doctrine is rooted in the notion that only the U.S. Supreme Court has appellate jurisdiction over final state-court judgments. *D.C. Court of Appeals v. Feldman*, 460 U.S. 462, 476 (1983). Accordingly, state-court litigants may not appeal adverse judgments to lower federal courts. *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 291-92 (2005). But the doctrine "does not prohibit all federal cases that are somehow related to a prior state-court decision." *In re Hamilton*, 540 F.3d 367, 372 (6th Cir. 2008). The Supreme Court has made clear that *Rooker-Feldman* does not bar federal court actions brought by parties who did not participate in the preceding state-court litigation. *Exxon Mobil Corp.*, 544 U.S. at 284; *Johnson v. De Grandy*, 512 U.S. 997, 1006 (1994); *see also Twin City Fire Ins. Co. v. Adkins*, 400 F.3d 293, 297 (6th Cir. 2005). The United States was not a party to the state-court divorce proceedings and thus defendants' reliance on *Rooker-Feldman* is misplaced.

Defendants fare no better under the full faith and credit statute, 28 U.S.C. § 1738, which requires a federal court to accord a state-court judgment the same preclusive effect that the judgment would have in a state court. The Florida divorce decree has no issue preclusive effect on the present federal-fraudulent-transfer case because the Florida domestic relations court did not necessarily decide whether Ileana received reasonably equivalent value in exchange for her transfer.

Issue preclusion, often termed "collateral estoppel," "refers to the effect of a judgment in foreclosing relitigation of a matter that has been litigated and decided." *Migra v. Warren City Sch. Dist. Bd. Of Educ.*, 465 U.S. 75, 77 n.1 (1984). Where, as here, a federal court is asked to give preclusive effect to a state court judgment, the federal court applies the preclusion law of the state in which the prior judgment was rendered. *Stemler v. City of Florence*, 350 F.3d 578, 586 (6th Cir. 2003) (citing *Migra*, 465 U.S. at 81). Accordingly, Florida law applies in determining whether the divorce decree has preclusive effect in this case.

Defendants do not satisfy the requirement under Florida preclusion law that an issue be fully litigated in a prior proceeding. *See Dadeland Depot, Inc. v. St. Paul Fire & Marine Ins. Co.*, 945 So. 2d 1216, 1235 (Fla. 2006). This conclusion is supported by *In re Fordu*, 201 F.3d 693 (6th Cir. 1999), which reached a similar result under Ohio law. In *In re Fordu*, we confronted the question of whether a divorce decree, which recited that the parties' agreement was "fair, just and equitable," precluded a later finding by a bankruptcy court that transfers brought about by the agreement were fraudulent. *Id.* at 696-97. We held there was no issue preclusion because "[a]lthough the issue of the fairness of the property division between the Debtor and [ex-wife] was the subject of a recitation contained in the Dissolution Decree, it was not actually litigated in the dissolution proceeding." *Id.* at 704. We concluded that the standard for the equitable distribution of marital property was "markedly different" than the "reasonably-equivalent-value test" under Ohio's fraudulent transfer law. *Id.* at 707-08. In particular, Ohio domestic relations courts were permitted to consider a host of equitable factors, including the duration of the marriage, tax consequences, and the liquidity of the property distributed, which could conceivably divide property in a way that would "not pass muster under the reasonable equivalence test." *Id.* at 708 (citing Ohio Rev. Code § 3105.171(F)).

Florida law prescribes a virtually identical set of factors for courts to consider when distributing marital property. *See* Fla. Stat. § 61.075(1). Therefore, in accordance with the reasoning in *In re Fordu*, the issue of whether Ileana received reasonably equivalent value in exchange for her transfer was not actually litigated in the Florida divorce proceedings and has no preclusive effect in the instant federal litigation.

Even accepting the defendants' contention that the federal court is bound to accept that Ileana received a reasonably equivalent value for her interest in the Florida lawsuit, it would fail to make a difference in the outcome because, as mentioned, whether Ileana received reasonably equivalent value is not dispositive of whether she is liable for *actual* fraudulent transfer under § 3304(b)(1)(A).

## V.

Samuel argues that the district court erred in granting summary judgment for the Government on his counterclaims, which sought contribution for the costs of maintaining the value of Ileana's transferred property. As the Government correctly observes, the district court concluded that Samuel had abandoned two out of his five counterclaims, namely his unjust enrichment and equitable subrogation claims. Samuel does not contest this on appeal. Samuel continues to seek common law contribution from the Government for costs of maintaining the Driftwood property and prosecuting the Florida lawsuit. He also requests the same relief under the court's equitable powers.

The Government argues that as a lienholder, rather than an owner, it is not obligated to share in the costs of upkeep for the debtor's assets. The Government presents authority from outside of the fraudulent transfer context in support of this position. Samuel puts forth no competing authority and instead appeals exclusively to the court's equitable powers. The

Government argues that the district court properly declined to exercise any equitable discretion because there was evidence that Samuel knew about and willingly participated in the fraudulent transfers and therefore had "unclean hands." Samuel makes no response to this argument, either. We may treat Samuel's failure to respond to the Government's assertions as a concession of their validity. *See Hassam F. v. Sessions*, 897 F.3d 707, 720 (6th Cir. 2018).

In any event, the record supports the Government's invocation of the unclean hands defense. The Government provides deposition testimony from Samuel admitting that he took steps to transfer Ileana's assets "because if I die I want my money taking care of my [] child, not making the government happy." It is also undisputed that Samuel was aware of the ongoing criminal investigation against Ileana when he received her interest in the Florida lawsuit. "The doctrine of unclean hands applies most appropriately to those cases where the party applying for relief engaged in nefarious conduct *related to the matter at issue* and that *adversely affected the other party*." *See Sakhawati v. Lynch*, 839 F.3d 476, 479 (6th Cir. 2016). Samuel's conduct is directly related to the relief he seeks and arguably harmed the Government. Moreover, in a related context, conduct similar to Samuel's has repeatedly been considered sufficient to deprive a transferee of the FDCPA's good-faith defense in 28 U.S.C. § 3307(a). *See United States v. Schippers*, 982 F. Supp. 2d 948, 973 (S.D. Iowa 2013) (collecting cases). Because the district court did not abuse its discretion in denying equitable relief, the court properly granted summary judgment on Samuel's counterclaims. *See Osborne v. Griffin*, 865 F.3d 417, 451 (6th Cir. 2017) (stating scope of review).

**VI.**

Reassignment to a different district judge on remand is not warranted in this case. While the district judge had a "history" with defendant's counsel, and his statements and actions could be read as injudicious, there is little evidence that his view of the merits was affected.

"Reassignment is an extraordinary power and should be rarely invoked." *Rorrer v. City of Stow*, 743 F.3d 1025, 1049 (6th Cir. 2014) (citation omitted). We have established a three-part test for determining whether reassignment is necessary:

> (1) whether the original judge would reasonably be expected to have substantial difficulty in putting out of his or her mind previously expressed views or findings;
>
> (2) whether reassignment is advisable to preserve the appearance of justice; and
>
> (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness.

*Id.* (quoting *U.S. ex rel. Williams v. Renal Care Grp., Inc.*, 696 F.3d 518, 532-33 (6th Cir. 2012)).

The Osbornes request reassignment based on what they perceive as a pre-existing bias against them, as demonstrated by a number of the judge's actions. First, the district judge had previously disciplined one of Ileana's attorneys, Craig Weintraub, for swearing at a fellow attorney in court. The judge had issued a thirteen-page public reprimand order, in which he wrote that "there is sufficient evidence to make a finding of criminal contempt" but not enough to warrant "creating a permanent criminal record for Attorney Weintraub."

Second, the judge made comments during scheduling and status conferences suggesting that he felt personally deceived by Ileana's property transfer. At one point, the judge asked for the names of the witnesses and notaries on Ileana's quitclaim deed. At another point, he characterized as "interesting" Samuel's attorney's explanation for the timing of the Driftwood property transfer, and asked rhetorically whether

> Ms. Osborne or her counsel [would ] have been better served by alerting the Court and the government to whatever arrangement had been put in place before her sentencing [in order to avoid] giving rise to what the government is probably going to argue is an inference . . . that the transfer was fraudulent and designed in some way, shape, or form [to] defeat the Court's restitution order?

Third, in a written order, the court stated that Samuel appeared to have filed a motion to appear at a status conference by phone "in an effort to avoid personally appearing at the status

conference as provided by rule and by this Court's order." The order further alleged that Samuel's motion was "directed more toward avoiding the Court's order to appear than a resulting work obligation." The order expressed doubt that Samuel had only learned of his work obligation thirty-six hours in advance.

Fourth, the judge took actions which the defendants say are examples of his improperly advocating for the Government. For instance, the judge asked the Government if it would like to amend its complaint after learning of additional evidence. The judge also encouraged the Government to file a motion to disqualify Samuel's attorney for what the judge thought was a conflict of interest under the Ohio Rules of Professional Conduct.

Considering these facts in light of the three relevant factors, the district judge's conduct does not meet the exacting standard for reassignment. The district judge did have a negative history with Mr. Weintraub, but defendants point to no evidence indicating that the district judge treated Mr. Weintraub differently than the other attorneys in the present case. In addition, many of the defendants' allegations of the district judge's "advocating" for the Government were examples of permissible attempts to govern a scheduling conference. Under Federal Rule of Civil Procedure 16(a), a court is tasked with "expediting disposition of the action," "establishing early and continuing control so that the case will not be protracted because of lack of management," and "facilitating settlement." Further, Rule 16(c)(2) provides that courts "may consider and take appropriate action," including "formulating and simplifying the issues, and eliminating frivolous claims or defenses," "amending the pleadings if necessary or desirable," and "obtaining admissions and stipulations about facts and documents to avoid unnecessary proof." Viewed in this context, the district judge's forceful questions about the timing of Ileana's transfer and his

encouragement of the Government to amend its complaint in response to new evidence are more understandable.

To be sure, the judge's tone and language in ruling on Samuel's motion to appear by phone can be read as accusing counsel of not being truthful. We have previously reassigned a case where the district judge's orders "contain[ed] increasingly accusatory language directed at [a party]." *John B. v. Goetz*, 626 F.3d 356, 364 (6th Cir. 2010) (per curiam). In contrast to *John B.*, however, this was one arguably accusatory order, not several, and the district judge here did not speak negatively about a party when disposing of substantive legal issues in the case. *See id.* One might also question the district judge's successful attempt to convince the United States to file a motion to disqualify the defendant's attorney. But this action, along with the judge's reaction to Samuel's motion to appear by phone, appear to stem from a strong focus on procedural rule-following rather than from any contempt for the defendants. In short, the district judge gave no indication that his frustration with the defendants would impact his perception of their case.

## VII.

For these reasons, we reverse the district court's grant of summary judgment for the Government on its claim for fraudulent transfer of the Driftwood property (count one) and remand for further consideration in light of this opinion. We affirm all other aspects of the district court's judgment.